IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| INTERNATIONAL EQUIPMENT TRADING, LTD., an Illinois corporation, | ) ) ) | |
| Plaintiff, | ) ) | No. 1:17-cv-05010 |
| v. | ) ) | Honorable Marvin E. Aspen |
| ILLUMINA, INC. | ) ) | Magistrate Judge M. David Weisman |
| Defendant. | ) | |

## SECOND AMENDED COMPLAINT

Plaintiff, International Equipment Trading, Ltd., by and through its attorneys, Levin Ginsburg, as and for its Second Amended Complaint against Defendant Illumina, Inc., states as follows:

## NATURE OF ACTION

1. This is an action brought pursuant to Section 2 of the Sherman Act, Sections 4 and 16 of the Clayton Act, and various state laws in order to enjoin and prevent Defendant Illumina, Inc. ("Illumina") from continuing to engage in certain predatory and anticompetitive business practices directed against Plaintiff, International Equipment Trading, Ltd. ("IET") and other secondary resellers of Illumina's products. IET also seeks treble compensatory damages, including lost profits, suffered by it as a result of Illumina's unlawful and anticompetitive conduct.

2. IET is in the business of sourcing pre-owned and new analytical laboratory equipment for sale, lease, rent or trade to independent laboratories, hospitals, research institutions and universities, both within the United States, including the State of Illinois, and internationally. The laboratory equipment sourced by IET includes sequencing unit systems and

required accessory instruments manufactured by Illumina, including the Model GA-2X, HiSeq 2500, HiSeq 4000, cBOT and MiSeq.

3. Illumina is a Delaware corporation with its principal place of business in San Diego, California. Illumina develops, manufactures and markets integrated systems for the analysis of genetic variation and biological function. Illumina provides a line of products and services that serve the sequencing, genotyping and gene expression markets. Its customers include genomic research centers, pharmaceutical companies, academic institutions, clinical research organizations and biotechnology companies.

4. Because Illumina sells its own equipment – both refurbished and new – it is a competitor of IET. However, because there are also repair and service elements to any sale or lease of Illumina's equipment, IET regularly brokers service contracts between Illumina and IET's customers. Illumina is the only company that services Illumina equipment.

5. Beginning in or around 2007 and continuing up to and including the date of filing this Second Amended Complaint, Illumina has been engaged in a practice of threatening IET's customers with what it calls, depending on the model, a $90,000 "site licensing fee" for the operating and data collection software necessary to operate its sequencing units once Illumina learns of a potential sale or lease by IET of one of Illumina's refurbished systems. Illumina, pursuant to its policy and practice, advises the customer that unless the customer buys or leases a new or used sequencing unit directly from Illumina, the software on the used instrument is subject to a non-transferable software license, and therefore, subject to a "site licensing fee." Illumina's practices have extended to other third-party resellers of Illumina's sequencing units in addition to IET.

6. For its model HiSeq 2500, Illumina generally demands a $70,000 site license fee. For the HiSeq 4000, Illumina generally demands a $90,000 site license fee. For the cBOT, Illumina generally demands a $6,000 site license fee. Despite Illumina's characterization of the operating and data collection software as being "licensed," Illumina actually sells the software as part of its sale of a new sequencing unit. The software is sold for a single, up-front payment with no recurring benefit to Illumina, and the "Software License Agreement" accompanying such sales is of perpetual duration and never requires the purchasers of such software to return or destroy the software unless the agreement is terminated by Illumina.

7. The "site licensing fee" is not, in reality, a mandatory fee and the threat of imposing the fee upon IET's customers is intended to kill the sale or lease between the customer and IET. The amount of the fee, or whether to charge it at all, is discretionary on the part of Illumina's regional sales representatives or service engineers, and both the imposition and the amount of the fee are arbitrary and solely intended to interfere with sales or leases of Illumina's own products on the secondary market. Illumina has repeatedly threatened customers in the secondary market to charge the $90,000 licensing fee only with regard to sequencing units purchased from third party resellers like IET.

8. In some instances, Illumina has also refused to service preowned equipment purchased by a customer from IET or from other third parties, or to sell reagents or other parts to that customer without what it deems to be a "proper" software license, refusing to recognize those customers as "authorized users." Consumers in need of replacement parts have no choice but to give in to Illumina's threats because no other manufacturer's replacement parts are compatible with Illumina machines or interchangeable with Illumina parts.

9. These "scare tactics" utilized by Illumina, insofar as they impact IET's profits, typically have the effect of quelling IET's sales of sequencing units to its customers or potential customers, sometimes in favor of sales of either refurbished or new equipment by Illumina itself.

10. Most recently, in March 2018, Illumina announced a "policy regarding the resale and support" of its HiSeq X instruments, stating that Illumina does not intend to support any such instruments being offered for resale to U.S. customers, including providing de-installation/re-installation services, entering into new service contracts, providing on-demand repairs, providing technical support, relicensing the Illumina software on the instruments, and/or the sale of related consumables. Thus, Illumina has in some instances refused to service or *relicense the software for* these preowned Illumina systems, even for a fee. If, in fact, Illumina is now refusing to service any of its preowned systems sold by third-party resellers entirely, it is making sales of those units by resellers impossible, eliminating the secondary market for its own systems, entirely.

11. By its predatory and discriminatory threats and conduct, Illumina has unlawfully attempted to create a monopoly within the secondary sequencing unit market, or alternatively, within the sub-market consisting of its own sequencing units, by effectively prohibiting the resale of its own products by IET or any other third party reseller, thereby eliminating, or attempting to eliminate, IET and any other resellers of sequencing units as competitors of Illumina in the secondary resale market.

## JURISDICTION, VENUE AND COMMERCE

12. The jurisdiction of this Court is involved pursuant to 28 U.S.C. § 1331 and §1337(a) because this action is brought pursuant to Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 26.

13. The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on diversity of citizenship:

    a. IET is an Illinois corporation with its principal place of business in Mundelein, Illinois. Therefore, IET is a citizen of Illinois.

    b. Illumina enjoys dual citizenship with its place of incorporation in Delaware, and its principal place of business located in San Diego, California.

    c. The amount in controversy exceeds $75,000, exclusive of interest and costs.

14. This Court also has supplemental jurisdiction over IET's state and common law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy and involve a common nucleus of operative fact. The exercise of supplemental jurisdiction avoids unnecessary duplication and multiplicity of actions and is in the interests of judicial economy, convenience, and fairness.

15. Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to this cause of action occurred in Lake County, Illinois, and because Defendants transact business within this district. See also 28 U.S.C. § 93(a)(1) (Northern District of Illinois comprises Lake County).

## FACTS COMMON TO ALL COUNTS

### *Relevant Markets of Genome Sequencing Units*

16. A distinct market exists for used genome sequencing units. First, new and used sequencing units are not easily interchangeable with one another because of the enormous price differential between new and used models. The difference in price between a new and used

sequencing unit of the same model can be up to five hundred thousand dollars. For many consumers who are in the market to purchase a used instrument, paying the premium price for a new instrument is simply not an alternative.

17. Further, the purchase of a sequencing unit represents a significant investment for the purchaser. In addition to the high purchase price and servicing costs, a purchaser of a sequencing unit must invest significant amounts of time and resources into validating operating platforms and developing methods and procedures for use in particular applications.

18. With regard to Illumina sequencing units specifically, the processes of platform validation and development of methodology involve steep learning curves and cannot be transferred or applied to other manufacturers' sequencing units. Thus, a consumer who has already established platforms and procedures for an Illumina sequencing unit will find it very difficult to change to a different manufacturer, or to add a non-Illumina machine to their collection of sequencing units. Additionally, many customers of contract research organizations insist that their samples be processed only by Illumina standardized equipment, due in large part to their sensitivity. Other customers require an Illumina machine because they have already developed their protocols on Illumina platforms. For these organizations, use of another manufacturer's instruments is not an option. Finally, replacement parts and servicing for Illumina sequencing units are not interchangeable with those of other manufacturers' machines. Thus, consumers in the market for an Illumina sequencing unit will not be able to easily substitute another manufacturer's instrument.

19. Illumina reportedly controls between approximately 71-75% of the overall genome sequencing market (both new and used instruments), and is predicted to control a substantially higher percentage of the sequencing market by 2023. In 2017, the total gross sales

of all genome sequencing units was approximately $3.2 billion, of which Illumina reported sales revenues of $2.3 billion.

20. On information and belief, the 2016 total global market revenue for refurbished genome sequencing systems was approximately $41,570,000 million, broken down as follows: (1) Illumina – 63%, (2) Thermo Fisher Scientific, Inc. – 24%, and (3) Others – 13%. On information and belief, the 2016 U.S. market share for refurbished genome sequencing systems was 67% for Illumina, 22% for Thermo Fisher Scientific, Inc., and 11% for Others, with higher projections for Illumina's U.S. market share for 2018. Based on these figures, it is believed that Illumina's market share in the refurbished sequencing unit submarket consisting of preowned Illumina instruments is far greater, and is approaching dominance, since other manufacturers of genome sequencing systems like Thermo Fisher Scientific, Inc. do not sell Illumina's refurbished systems.

*Lost Sales Regarding Instruments Expressly Exempt From Licensing Fees Under DLL Agreement*

21. De Lage Landen Financial Services, Inc. ("DLL") provides lease or other financing of Illumina instruments and systems, many of which were sold to DLL by Illumina. On information and belief, Illumina entered into an agreement with DLL, pursuant to which those parties agreed that any Illumina equipment owned or leased by DLL is not subject to a re-licensing fee from Illumina for a new customer ("DLL Agreement"). Thus, pursuant to the DLL Agreement, Illumina consents to the transfer by third party resellers engaged by DLL to sell the formerly leased/financed Illumina systems, including IET, to their end-user customers of the software loaded on those instruments. Notwithstanding this agreed upon exemption, Illumina has repeatedly attempted to interfere with sales by threatening IET's customers with a "licensing fee." By way of example only, despite the fact that the units in question were subject to the DLL

Agreement, Illumina advised representatives of Gen Era Diagnostik A.S and the Uniformed Services University of the Health Sciences that if they purchased the units used through IET, they would be required to pay the licensing fee. Further, Illumina's representatives have, on occasion, represented to potential customers that they must pay the licensing fee for equipment subject to the DLL Agreement and, on a few of those occasions, DLL's legal representatives have intervened on behalf of the potential customer.

22. On other occasions, despite the equipment being exempt from license fees due to the DLL Agreement, Illumina will refuse to service equipment that was subject to the DLL Agreement unless and until the customer agrees to purchase a service contract for $70,000. For example, GoPath Laboratories of Buffalo Grove, Illinois purchased a HI SEQ 2500 from IET that was subject to the DLL Agreement. After DLL eventually intervened, the customer was able to purchase the unit from IET without paying Illumina a license fee. Illumina installed the system and agreed to provide reagents – substances added to the system to cause a certain chemical reaction or test if a certain chemical reaction occurs. Despite that fact, when the system had a problem, Illumina refused to repair it unless and until GoPath purchased a $70,000 "service contract." Illumina does not typically require customers who pay the license fee to purchase a service contract. Further, since Illumina is taking the position that GoPath cannot transfer the software license, GoPath is unable to sell the instrument because if the buyer is required to pay a $70,000 licensing fee plus installation costs (estimated to be between $80,000-$90,000), these fees exceed the current market value of that system.

### *Additional Actual Lost Sales Resulting From Illumina's Predatory Conduct*

23. In addition to the forgoing lost sales of "exempt" instruments pursuant to the DLL Agreement, Illumina's predatory conduct has also resulted in other lost sales. For example, IET

lost a sale of a HiSeq 4000 to the University of Central Florida because Illumina advised the customer that it would not service, install or sell reagents for the system unless the university paid $90,000 to Illumina for the site transfer license.

### *Illumina's Attempted Interference With IET's Sales*

24. Using its scare tactics directed to IET's customers, Illumina has interfered with actual and potential sales.

### COUNT I

### Violation of § 2 of Sherman Act
### (15 U.S.C. § 2 – Attempted Monopolization)

25. IET realleges Paragraphs 1-24 as Paragraph 25 of this Count I, as though fully set forth herein.

26. Section 2 of the Sherman Act provides:

Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court. 15 U.S.C. § 2.

27. Illumina's sequencing units are marketed to and sold to customers located within the State of Illinois, throughout the United States, and the world. Therefore, Illumina's conduct substantially affects interstate and foreign commerce.

28. The market for used genome sequencing units constitutes a distinct market. As compared with other types of sequencing units or with each other, the used sequencing units are not substitutable, and there is a very low cross-elasticity of demand. Further, the prohibitively high cost of new sequencing units places used machines of both of these types in their own sub-market.

29. Alternatively, the market for used Illumina genome sequencing units constitutes a distinct market within the used sequencing unit market. As compared with other manufacturers' machines (new or used), used Illumina sequencing units are not easily interchangeable, and there is a very low cross-elasticity of demand between Illumina machines and those of its competitors. Further, the prohibitively high cost of new sequencing units places used Illumina machines in their own sub-market.

30. In violation of Section 2 of the Sherman Act (15 U.S.C. § 2), Illumina engaged in the foregoing anticompetitive conduct in an attempt to monopolize one or more of the above used sequencing unit markets by attempting to eliminate competition from third-party resellers like IET. Such violations began in 2007 are continuing up to and including the date of filing this Complaint, and will continue unless the relief prayed for is granted.

31. By virtue of the above conduct, Illumina has demonstrated the specific intent to destroy competition or build a monopoly over the foregoing secondary sequencing unit markets.

32. Illumina's practice of threatening IET's customers with a $70,000-90,000 "site licensing fee," or lesser amounts, constitutes predatory and anticompetitive conduct. Illumina's threats are false statements because: (1) as set forth in Count VII herein, the first sale doctrine prohibited Illumina from imposing the fee, and (2) Illumina was contractually prohibited from imposing the fee in certain instances under the DLL Agreement. Instead, Illumina uses these threats as a way to drive IET and other third-party resellers from the foregoing sequencing unit markets and thereby strengthen its dominant position within these markets. Illumina employs coercive mechanisms in tandem with its threats, including its refusal to service used equipment purchased through third-party resellers like IET, imposing exorbitant markups on replacement parts to consumers who purchase sequencing units from third-party resellers like IET or who do

not enter into service contracts with Illumina, and leveraging its inherent authority as an industry leader to coerce sales away from third-party resellers like IET.

33. Having fewer than a handful of competitors worldwide who also manufacture sequencing units, Illumina maintains a market share of approximately 71-75% in the genome sequencing unit industry generally, as well as a market share of approximately 63-67% in the secondary resale market of genome sequencing units, with a substantially greater percentage in the submarket consisting of its own sequencing systems after eliminating other manufacturers as competitors in that sub-market. Thus, the submarket of preowned Illumina sequencing systems consists of Illumina and third-party dealers. IET is one of fewer than five companies in the United States and Canada who sell Illumina's sequencing units in the secondary markets. Besides IET, other third party resellers of Illumina's units include Certified Gene Tool, Carmet Scientific, and some end-user E-bay sellers, who are believed to generate annual sales revenues of used sequencing units below that of IET (preowned genome sequencers are currently selling on E-bay for anywhere between $15,500-65,000). IET, Illumina's closest competitor in the sequencing unit resale market consisting of preowned Illumina instruments had total sales of used Illumina sequencing units of approximately $600,000 for the previous five years, or an average of $120,000 per year. Based on these facts, Illumina occupies substantial market power and dominance within the resale market for genome sequencing units, as well as in the submarket for preowned sequencers manufactured by Illumina.

34. Given (a) Illumina's substantial position in the market for used sequencing units, or alternatively, within the used Illumina sequencing unit submarket, (b) the breadth of adoption and expansion of its anticompetitive policies by its various sales representatives throughout the United States and internationally, and (c) the excessive cost of the "software transfer fee," health

check, installation and service contract totaling between $180,000-210,000 depending on the model, coupled with Illumina's refusal to service equipment not purchased directly from them, all of which makes entry into Illumina's used sequencing market very difficult, if not impossible, a dangerous probability exists that its attempts to monopolize the secondary sequencing unit markets will succeed.

35. If Illumina is successful in monopolizing the foregoing sequencing unit markets, competition will be harmed because Illumina will (a) be able to inflate the price of used sequencing units in the relevant markets, and/or (b) artificially reduce the supply of used sequencing units, and/or (c) make it impossible for IET and other third party resellers to move their inventory.

## COUNT II

### Violation of §§ 4 and 16 of Clayton Act
### (15 U.S.C. §§ 15(a), 26)

36. IET realleges Paragraphs 1-24 and 26-35 as Paragraph 36 of this Count II, as though fully set forth herein.

37. Section 4 of the Clayton Act provides, in relevant part:

"… any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a).

38. Moreover, Section 16 of the Clayton Act provides, in relevant part:

"Any … corporation … shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws…". 15 U.S.C. § 26.

39. Thus, Illumina's actual and threatened violations of § 2 of the Sherman Act, as

alleged in Count I herein, establishes a private right of action for IET and entitles IET to relief under Sections 4 and 16 of the Clayton Act, respectively, in the form of treble compensatory damages, costs, attorneys' fees, prejudgment interest (15 U.S.C. § 15(a)) and injunctive relief (15 U.S.C. § 26).

## COUNT III

### Violation of Illinois Consumer Fraud and Deceptive Business Practices Act
### (815 ILCS 505/1 *et seq.*)

40. IET realleges Paragraphs 1-24, 26-35 and 37-39 as Paragraph 40 of this Count III, as though fully set forth herein.

41. Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois Consumer Fraud Act") provides, in relevant part:

> "Unfair methods of competition and unfair or deceptive acts or practices… or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" … in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

42. Illumina violated the Illinois Consumer Fraud Act by engaging in the conduct described herein including, but not limited to, misrepresenting the true nature of the license, calculated solely to deceive consumers into purchasing its sequencing units on the secondary market from Illumina, as opposed to IET or one of its other competitors.

43. Illumina's deceptive and unfair conduct occurred in the course of conduct involving the trade and commerce of sequencing unit sales on the secondary market, and substantially affects consumers, including Illinois consumers, and consumer protection concerns.

44. Through its deceptive and unfair conduct, Illumina has directly and/or indirectly harmed consumers, including Illinois consumers, by affecting competition generally, and by eliminating the advantages available to consumers where competition is fostered, including, but

13

not limited to the consumers' ability to purchase product on the secondary market from the seller who they believed would provide the best prices and best services. Some of the Illinois consumers harmed by Illumina's practices include: (a) GoPath Laboratories located in Buffalo Grove, Illinois, (b) the University of Chicago located in Chicago, Illinois, (c) Tempus located in Chicago, Illinois, (d) Argon National Laboratory located in Argon, Illinois, and (e) ACGT Inc. located in Wheeling, Illinois. On one or more occasions, Illumina directed its unfair and deceptive conduct directly to the Illinois consumer in the State of Illinois.

45. Illumina's deceptive and unfair conduct has also resulted in damage to IET in the form of lost profits, as alleged herein. On information and belief, Illumina's conduct has resulted in lost sales of preowned Illumina equipment to the following Illinois customers dating back to 2010: (i) loss of sales of two separate Illumina GA2X systems to the University of Chicago in Chicago, Illinois, (ii) loss of sale of a HiSeq 2500 to Tempus in Chicago, Illinois, (iii) loss of sale of Illumina GA2X to Argon National Laboratory in Argon, Illinois, and (iv) loss of sale of Illumina HiSeq 2500 to ACGT Inc. in Wheeling, Illinois.

46. Illumina's willful violations of the Illinois Consumer Fraud Act, as alleged herein, entitle IET to relief in the form of compensatory damages, costs, attorneys' fees, punitive damages, and injunctive relief under Section 10a of the Act.

## COUNT IV

### Violation of Illinois Uniform Deceptive Trade Practices Act
### (815 ILCS 510/1 *et seq*.)

47. IET realleges Paragraphs 1-24, 26-35, 37-39, and 41-46 as Paragraph 47 of this Count IV, as though fully set forth herein.

48. Section 2 of the Uniform Deceptive Trade Practices Act ("DTPA") provides, in relevant part:

14

(a) A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:
\* \* \*
(11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;
(12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

49. Illumina violated Section 2 of the DTPA by willfully engaging in the deceptive trade practices enumerated herein, entitling IET to injunctive relief, costs and reasonable attorneys' fees.

## COUNT V

### Violation of Illinois Antitrust Act
### (740 ILCS 10/1 *et seq.*)

50. IET realleges Paragraphs 1-24, 26-35, 37-39, 41-46, and 48-49 as Paragraph 50 of this Count V, as though fully set forth herein.

51. Section 10/3(3) of the Illinois Antitrust Act provides that "Every person shall be deemed to have committed a violation of this Act who shall … [e]stablish, maintain, use, or attempt to acquire monopoly power over any substantial part of trade or commerce of this State for the purpose of excluding competition … in such trade or commerce." 740 ILCS 10/3(3).

52. Illumina violated the Illinois Antitrust Act by engaging in the conduct alleged herein, resulting in damage to IET and entitling it to compensatory damages, costs, attorneys' fees, and injunctive relief under Section 7 of the Act.

## COUNT VI

### Intentional Interference with a Prospective Economic Advantage

53. IET realleges Paragraphs 1-24, 26-35, 37-39, 41-46, 48-49, and 51-52 as Paragraph 53 of this Count VI, as though fully set forth herein.

15

54. Illumina knew that IET had a reasonable expectancy of completing sales and/or leases of the refurbished sequencing units to those customers specified herein and others.

55. Illumina nevertheless intentionally, maliciously and without justification acted with the purpose of interfering with IET's reasonable prospective economic advantage, resulting in damage to IET and entitling it to compensatory damages and injunctive relief.

## COUNT VII

### Declaratory Judgment Under 28 U.S.C. §2201(a)

56. IET realleges Paragraphs 1-24, 26-35, 37-39, 41-46, 48-49, 51-52, and 54-55 as Paragraph 56 of this Count VII, as though fully set forth herein.

57. Pursuant to 17 U.S.C. §109(a), "the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord."

58. The operating and data collection software which is the subject of Illumina's threatened "site licensing fee" are copies lawfully made under Title 17, and are owned by third parties from whom IET sources sequencing unit equipment.

59. When Illumina sells new sequencing units to its customers, such sales include, as part of the purchase price, a sale of the operating and data collection software. Such sales consist of a single, up-front payment to Illumina with no further payments or other recurring benefit to Illumina. The software agreements accompanying such sales are of perpetual duration and never require the purchaser to return or destroy the software unless the agreement is terminated by Illumina. As such, and notwithstanding that Illumina has characterized its software as being "licensed," including in the DLL Agreement, the initial transfer of Illumina's operating and data

16

collection software to its customers constitutes a "sale" for the purposes of 17 U.S.C. §109, and the purchasers of such software are "owners" of lawfully made copies.

60. Pursuant to 17 U.S.C. §109(a), any such "owner" of the operating and data collection software is entitled to sell or otherwise dispose of its copy without the authority of Illumina

61. By threatening IET's customers, including Illinois consumers, with excessive "site licensing fees" for the operating and data collection software and otherwise interfering with IET's sales, including without limitation Illumina's refusal to service sequencing units without what it deems to be a "proper" software license, Illumina has caused IET to lose sales of sequencing units it otherwise would have been able to make. If Illumina is allowed to continue in its course of conduct, IET will continue to lose sales of sequencing units it otherwise would be able to make.

62. The Declaratory Judgment Act provides as follows:

> In a case of actual controversy within its jurisdiction … any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.

28 U.S.C. §2201(a)

63. A real and actual controversy exists between IET and Illumina as to whether Illumina may charge or threaten to charge a "site licensing fee" to customers purchasing Illumina sequencing units from IET.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff International Equipment Trading, Ltd. respectfully requests that the Court enter judgment in its favor and against Defendant Illumina LLC as follows:

A. Declaring that Defendant violated and is in violation of the Sherman Act § 2, the Clayton Act §§ 4 and 16, the Illinois Consumer Fraud and Deceptive Business Practices Act, and

the Illinois Uniform Deceptive Trade Practices Act, the Illinois Antitrust Act, and that it tortuously interfered with Plaintiff's business expectancy as alleged herein;

  B. Awarding Plaintiff treble compensatory damages sustained by Plaintiff as a result of Defendant's actions, including lost profits, together with prejudgment interest thereon;

  C. Ordering injunctive relief preventing and enjoining Defendant and all persons acting on its behalf from engaging in the predatory and unlawful practices alleged herein;

  D. Awarding Plaintiff the costs, expenses, and reasonable attorneys' fees and experts' fees for bringing and prosecuting this action;

  E. Declaring that IET's brokering of the sale of Illumina's operating and data collection software to its customers is protected by 17 U.S.C. §109, and does not infringe on Illumina's copyrights or other rights, and therefore that Illumina has no right to charge or threaten to charge a "licensing fee" to IET's customers or otherwise interfere with IET's brokering of authentic, used copies of Illumina's software; and

  F. Ordering such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

            Respectfully submitted,

            INTERNATIONAL EQUIPMENT
            TRADING, LTD., Plaintiff


            By: /s/ Howard L. Teplinsky
              One of Its Attorneys

Howard L. Teplinsky – 6197501
Katherine A. Grosh – 6277577
Levin Ginsburg
180 N. LaSalle Street, Suite 3200
Chicago, IL 60601
(312) 368-0100
hteplinsky@lgattorneys.com
kgrosh@lgattorneys.com