# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| INTERNATIONAL EQUIPMENT TRADING, LTD., | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 17 C 5010 |
| v. | ) Hon. Marvin E. Aspen |
| | ) |
| ILLUMINA, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

Plaintiff International Equipment Trading, Ltd. ("IET") alleges Defendant Illumina, Inc. ("Illumina") engaged in predatory and anticompetitive behavior that violated federal antitrust and Illinois law. (2d Am. Compl. (Dkt. No. 54) ¶ 1.) We previously dismissed Counts I–V of IET's first amended complaint without prejudice. (Order (Dkt. No. 44) at 17.) Presently before us is Illumina's motion to dismiss Counts I–V of IET's second amended complaint with prejudice. (Mot. (Dkt. No. 55).) For the following reasons, we deny Illumina's motion.

In addition, Illumina shall file its answer to IET's second amended complaint on or before September 12, 2018. The principal attorneys for Illumina and IET shall appear before the Court with an agreed written discovery plan at the Court's status call on October 18, 2018 at 10:30 a.m.

## BACKGROUND

For the purposes of a motion to dismiss, "we accept the well-pleaded facts in the complaint as true." *McCauley v. City of Chi.*, 671 F.3d 611, 616 (7th Cir. 2011). IET, an Illinois

corporation with its principal place of business in Mundelein, Illinois, sells, rents, trades, and leases laboratory equipment to laboratories, hospitals, universities, and research institutions across the United States and internationally. (2d Am. Compl. ¶¶ 2, 13.) As part of its business, IET sources various models of used or refurbished genome sequencing unit systems ("sequencing units") and required accessory instruments manufactured by Illumina. (*Id.* ¶¶ 2.) Illumina, a Delaware corporation with its principal place of business in San Diego, California, manufactures and markets "integrated systems" that "serve the sequencing, genotyping and gene expression markets" and sells its used sequencing units[1] in competition with IET. (*Id.* ¶¶ 3–4.) While IET "regularly brokers service contracts between Illumina and IET's customers," Illumina is the only company that services its equipment. (*Id.* ¶ 4.)

IET alleges that since around 2007, once Illumina learns of a possible sale or lease by IET and other third-party resellers of a refurbished Illumina sequencing unit, Illumina engages in "scare tactics" that are "intended to kill the sale or lease between the customer and IET." (*Id.* ¶¶ 5, 7, 9.) Specifically, IET alleges Illumina has a practice of informing IET's potential customers that unless they buy or lease a new or used Illumina sequencing unit from Illumina, they must pay a significant "site licensing fee" for operation and data collection software needed to operate a used Illumina sequencing unit. (*Id.* ¶¶ 5–6.) IET alleges this fee ranges from $6,000.00 to $90,000.00 depending on the model. (*Id.*) IET claims Illumina's sales representatives and servicing engineers have discretion in charging the fee, and only threaten the fee to interfere with sales from third-party resellers like IET. (*Id.* ¶¶ 7–9.) IET further alleges Illumina sometimes charges the fee for machines exempt from site licensing fees based on a

---

[1] Based on IET's complaint, it appears Illumina sells used sequencing units that are made by Illumina in addition to used units made by other manufacturers. (*See* 2d Am. Compl. ¶ 20 (alleging Illumina's market share is higher in the market of Illumina used sequencing units as compared to its market share in the refurbished sequencing unit market generally).)

preexisting contract between Illumina and De Lage Landen Financial Services, Inc. ("DLL").[2].

(*Id.* ¶ 21–22.)

IET further alleges that when the purchasers do not pay Illumina the site licensing fee, Illumina sometimes refuses to service sequencing units purchased from IET, deeming these customers as unauthorized users. (*Id.* ¶ 8.) Illumina also allegedly either refuses to provide needed services, parts, and software for preowned Illumina systems they did not sell, or charges "exorbitant markups" to do so. (*Id.* ¶¶ 8, 10, 22, 32.) IET claims customers who need replacement parts "have no choice but to give in to Illumina's threats" because only Illumina's replacement parts are compatible with Illumina machines, and only Illumina services Illumina units. (*Id.* ¶¶ 4, 8.) Specifically, IET states that Illumina announced in March 2018 that it will no longer support any HiSeq X sequencing units resold by third-parties to customers in the United States, including servicing, repairing, or selling "related consumables" to customers with these preowned systems. (*Id.* ¶ 10.) IET claims that if enforced, Illumina's policy will "eliminat[e] the secondary market" for HiSeq X units completely. (*Id.*)

Based on these allegedly anticompetitive tactics, IET alleges Illumina "has unlawfully attempted to create a monopoly within the secondary sequencing unit market, or alternatively, within the sub-market consisting of [Illumina] sequencing units." (*Id.* ¶ 11.) As a result, IET claims it has lost sales, including the sale of sequencing units to: (1) the University of Central Florida, (2) the University of Chicago, (3) Tempus, (4) Argon National Laboratory, and (4) ACGT Inc. (*Id.* ¶¶ 23, 45.)

IET's second amended complaint mirrors the seven counts of its first amended complaint. IET alleges Illumina violated various antitrust laws, and asserts attempted monopolization claims

---

[2] DLL allegedly leases and finances Illumina equipment, and often Illumina sells the instruments and systems to DLL directly. (2d Am. Compl. ¶ 21.)

3

under § 2 of the Sherman Act, 15 U.S.C. § 2 (Count I); §§ 4 and 16 of the Clayton Act,

15 U.S.C. §§ 15(a), 26 (Count II); and the Illinois Antitrust Act ("IAA"), 740 ILCS 10/1 *et seq.*

(Count V). (*Id.* ¶¶ 25–35, 36–39, 50–52.) IET claims Illumina's "predatory and anticompetitive

conduct" in charging site licensing fees has been an attempt to "drive IET and other third-party

resellers from the . . . sequencing unit markets and thereby strengthen its dominant position

within these markets." (*Id.* ¶ 32.)

IET's second amended complaint also includes claims under the Illinois Consumer Fraud

and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.* ("ICFA") (Count III) and Illinois

Uniform Deceptive Trade Practices Act, 815 ILCS 510/1 *et seq.* ("UDTPA") (Count IV) based

on Illumina's alleged willful engagement in "deceptive and unfair conduct." (*Id.* ¶¶ 40–49.)

Finally, IET alleges Illumina intentionally interfered with a prospective economic advantage

(Count VI) and seeks a declaratory judgment pursuant to the Declaratory Judgment Act,

28 U.S.C. § 2201(a) deciding whether Illumina "may charge or threaten to charge" a site

licensing fee to customers purchasing Illumina sequencing units from IET (Count VII). On

February 28, 2018, we dismissed without prejudice the same Counts I through V of IET's first

amended complaint and denied Illumina's motion to dismiss Counts VI and VII pursuant to

Federal Rule of Civil Procedure 12(b)(6).

On April 16, 2018, Illumina filed a motion to dismiss Counts I through V of IET's second

amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Mot. at 1.) Illumina

argues "IET's attempt to resuscitate these claims in the Second Amended Complaint . . . falls

short." (Def.'s Mem. in Support of Mot. To Dismiss ("Mem.") (Dkt. No. 56) at 1.) Illumina

contends IET's attempted monopolization claims should be dismissed because Illumina has

failed to adequately plead any of the requisite elements. (*Id.* at 3–12.) Furthermore, Illumina

argues IET failed to state a claim under the ICFA and UDTPA "because (1) IET still does not allege that it lost a sale to any Illinois customers and (2) none of the alleged misrepresentations falls within the purview of the UDTPA." (*Id.* at 13.)

## LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) governs Illumina's motion to dismiss. "The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits." *Gibson v. City of Chi.*, 910 F.2d 1510, 1520 (7th Cir. 1990) (internal citation omitted). When considering a motion to dismiss under Rule 12(b)(6), we accept as true all well-pleaded facts alleged in the complaint and view them in the light most favorable to the plaintiff. *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010). While "detailed factual allegations" are not required to survive a motion to dismiss, the complaint must "state a claim [for] relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949–50 (2009) (internal quotation marks omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007)). The plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft*, 556 U.S. at 678, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 556, 127 S. Ct. at 1965). While the plaintiff need not plead "detailed factual allegations," the complaint must allege facts sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555, 127 S. Ct. at 1964–65. However, to protect defendants from expensive discovery in antitrust cases, a plaintiff's claim must have a "reasonably founded hope that the [discovery] process will reveal relevant evidence" to support a claim. *Twombly*, 550 U.S. at 558–59, 127 S. Ct. at 1966–67.

## ANALYSIS

# I.   ATTEMPTED MONOPOLIZATION CLAIMS (COUNTS I, II, & V)

We first consider whether IET sufficiently pled its antitrust claims to survive a Rule 12(b)(6) motion to dismiss.  Our analysis focuses on the requirements of § 2 of the Sherman Act, as IET's Clayton Act and IAA claims "stand or fall with the Sherman Act Claim."[3] *Int'l Equip. Trading v. AB SCIEX LLC*, No. 13 C 1129, 2013 WL 4599903, at *3 n.3 (N.D. Ill. Aug. 29, 2013); *Hon Hai Precision Indus. Co. v. Molex, Inc.*, No. 08 C 5582, 2009 WL 310890, at *3 (N.D. Ill. Feb. 9, 2009).  At the pleading stage of an attempted monopolization claim under Section 2 of the Sherman Act, the plaintiff must preliminarily establish the "relevant market that the defendant has purportedly attempted to monopolize." *Attempted Monopolization*, William Holmes & Melissa Mangiaracina, Antitrust Law Handbook § 3:6; *see Nucap Indus., Inc. v. Robert Bosch LLC*, 273 F. Supp. 3d 986, 1011 (N.D. Ill. 2017) ("[F]ailure to offer a plausible relevant market is a proper ground for dismissing an antitrust claim at the Rule 12(b)(6) stage.") (internal citation omitted).  The plaintiff must also adequately plead that a defendant (1) engaged in predatory or anticompetitive conduct, (2) specifically intended to acquire monopoly power, and (3) reached a stage based on defendant's actions and market position where there is a dangerous probability defendant will achieve an actual monopoly.  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456, 113 S. Ct. 884, 890–91 (1993); *Lektro-Vend Corp. v. Vendo, Co.*, 660 F.2d 255, 270 (7th Cir. 1981); *Hon Hai Precision Indus.*, 2009 WL 310890, at *2.  Illumina argues that IET has failed to sufficiently plead any of these elements, which we consider in turn.  (Mem. at 3.)

## A.  Market Definition

---

[3] IET's Clayton Act claim depends on the survival of its Sherman Act claim because Sections 4 and 16 of the Clayton Act merely establish a private right of action for any person injured by a violation of the Sherman Act. 15 U.S.C. § 15.

Illumina first argues that IET's antitrust claims should be dismissed because IET has failed to plead a "legally cognizable" market. (*Id.* at 3.) To successfully prove an attempted monopolization claim, the plaintiff must define the relevant market in terms of relevant geographic area and product. *Spectrum Sports, Inc*, 506 U.S. at 456, 113 S. Ct. at 890–91 (finding the issue generally necessary to plead the monopoly power element); *Right Field Rooftops, LLC v. Chi. Baseball Holdings*, LLC, 87 F. Supp. 3d 874, 886 (N.D. Ill. 2015). Accordingly, "failure to offer a plausible relevant market is a proper ground for dismissing an antitrust claim." *Right Field Rooftops*, 87 F. Supp. 3d at 886; *see also Ploss v. Kraft Foods Grp., Inc.*, 197 F. Supp. 3d 1037, 1070 (N.D. Ill. 2016) (considering the identification of a relevant market on a motion to dismiss a § 2 claim). Market definition, however, is very fact-intensive and we hesitate to grant motions to dismiss for failure to plead a relevant market, unless "the alleged relevant market clearly does not encompass all interchangeable substitute products or when a plaintiff fail[s] even to attempt a plausible explanation as to why a market should be limited in a particular way." *Ploss*, 197 F. Supp. 3d at 1071–72 (citing *In re Dairy Farmers of Am., Inc. Cheese Antitrust Litig.*, 767 F. Supp. 2d 880, 901 (N.D. Ill. 2011)).

Under "§ 2 of the Sherman Act, a market is defined by reasonable interchangeability of products and the cross-elasticity of demand for those products. In other words, the products in a market must have unique attributes that allow them to be substituted for one another, but make them difficult to replace with substitute products from outside the market." *In re Dairy Farmers*, 767 F. Supp. 2d at 901 (citing *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 394–95, 76 S. Ct. 994, 1007 (1956)). IET proposes two alternative markets: (1) the market for used genome sequencing units ("used unit market"), and (2) the market for

used Illumina genome sequencing units ("used Illumina unit market"). (2d Am. Compl. ¶¶ 28–29.) Illumina argues neither market is legally cognizable.

Illumina first challenges both markets for "improperly exclud[ing] *new* genome sequencing systems," and argues new units are substitutes to used units. (Mem. at 4.) IET alleges used sequencing units are not substitutes for new units because of a substantial price differential, up to $500,000.00 between new and used units.[4] (2d Am. Compl. ¶¶ 16, 28–29.) Considering the difference in price, IET describes new units to be so expensive they are cost-prohibitive for many customers. (*Id.*) Illumina asserts that mere price differential does not mean new and used units are not in the same markets. (Mem. at 4.) Considering the highly factual nature of market definition, making inferences in IET's favor, we find IET has sufficiently pled that used units could constitute a separate sub-market from new units, especially considering the significant price differential IET alleges exists between the two types of units. *See Beatrice Foods Co. v. F.T.C.*, 540 F.2d 303, 309 (7th Cir. 1976) (finding price distinctions can lead to separate market definitions when the products "are sold in clearly separate price groupings"); *Avnet, Inc. v. F.T.C.*, 511 F.2d 70, 77 (7th Cir. 1975) (finding variance in price between new and used products sufficiently varied to support finding that new and used products constitute different submarkets).

Illumina also challenges the used Illumina unit market specifically, arguing the proposed single-brand market fails as a matter of law. (Mem. at 5–6.) In "rare circumstances," a single

---

[4] Illumina also alleges IET concedes new and used sequencing units are substitutes in use based on language in the Second Amended Complaint. (Mem. at 4 (citing 2d Am. Compl. ¶ 5).) We agree with IET that this interpretation of IET's second amended complaint misconstrues its language. (Resp. at 6.) Instead of conceding a customer seeking a used unit "may instead purchase a 'new or used sequencing unit' directly from Illumina" (Mem. at 4), this paragraph merely describes Illumina's alleged sales behavior, including threatening the imposition of a site licensing fee "unless the customer buys or leases a new or used sequencing unit directly from Illumina" (2d Am. Compl. ¶ 5).

brand of a product can constitute its own market. *In re Dealer Mgmt. Sys. Antitrust Litig.*, No. 18 C 864, 2018 WL 2193236, at *21 (N.D. Ill. May 14, 2018) (slip op.); *see also Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 481–82, 112 S. Ct. 2072, 2090 (1992) (establishing possibility of single-brand markets). A market composed of a single brand can be viable if a plaintiff can prove the product cannot be substituted by any other brand's products. *AB SCIEX LLC*, 2013 WL 4599903, at *4.

Here, IET offers multiple reasons why used Illumina sequencing units are not interchangeable with another brand. For example, preexisting Illumina sequencing unit customers allegedly cannot easily switch to a different manufacturer because the processes of "platform validation and development of methodology involve steep learning curves," especially when the customer has other Illumina sequencing units or has developed protocols on Illumina platforms. (2d Am. Compl. ¶ 18.) IET also avers some research institutions can only use Illumina sequencing units "due in large part to their sensitivity." (*Id.*) Based on these specific allegations, we find IET has pled conceivable explanations why Illumina units are not replaceable with other brands for some customers. *Cf. AB SCIEX LLC*, 2013 WL 4599903, at *4 (dismissing proposed single-brand market where plaintiff failed to plead any facts demonstrating the product is "unique and cannot be substituted with other manufacturer's [products]"). Furthermore, whether used sequencing unit customers are truly locked in to Illumina's brand is a question of fact not properly determined at this stage. *Eastman Kodak*, 504 U.S. at 482, 112 S. Ct. at 2090 ("The proper market definition in this case can be determined only after a factual inquiry into the commercial realities faced by consumers.") (internal citation omitted). We accordingly find that IET has sufficiently pled both proposed markets.

## A. Predatory or Anticompetitive Conduct

Next, Illumina argues IET has failed to plead it engaged in any predatory or anticompetitive conduct. (Mem. at 10.) "Predatory conduct may be broadly defined as conduct that is in itself an independent violation of the antitrust laws or that has no legitimate business justification other than to destroy or damage competition." *Great Escape, Inc. v. Union City Body Co.,* 791 F.2d 532, 541 (7th Cir. 1986); *see also Endsley v. City of Chi.*, 230 F.3d 276, 283 (7th Cir. 2000) ("Under § 2, intent to obtain a monopoly is unlawful only where an entity seeks to maintain or achieve monopoly power by anticompetitive means.").

IET alleges Illumina engaged in a number of anticompetitive behaviors, primarily threatening to charge customers who do not purchase used Illumina sequencing units from Illumina directly a site licensing fee; selectively imposing the site licensing fee to interfere with sales from third-party resellers; and refusing, or charging "exorbitant markups," to service or sell replacement parts for sequencing units sold by third-parties. (2d Am. Compl. ¶¶ 5–7, 32, 34 (alleging the total cost of the software transfer fee, health check, installation, and service contracts of used Illumina sequencing units totals between $180,000.00 and $210,000.00).)

We first consider IET's allegations regarding Illumina's statements about its ability to impose site licensing fees. IET claims that since 2007, once Illumina learns of a potential sale or lease by IET of a used Illumina sequencing unit, with the intent to "kill" the sale or lease with IET, Illumina would contact the potential customer and threaten to impose a site licensing fee for the used unit's operation and data collection software needed to operate the unit. (2d Am. Compl. ¶ 5.) Among other complaints about these threats, IET argues Illumina does not have the ability to charge site licensing fees for purchasers of used Illumina sequencing units, and that these statements constitute misrepresentations. (Resp. at 10–11.)

Generally, false statements accompanied with an "enforcement mechanism" can constitute predative conduct under antitrust law. *See Mercatus Grp., LLC v. Lake Forest Hosp.*, 641 F.3d 834, 851 (7th Cir. 2011) (noting that an anticompetitive threat is not actionable anticompetitive action without "some sort of 'enforcement mechanism' designed somehow to coerce or compel the competitor to head the admonition") (internal citation omitted); *AB SCIEX LLC*, 2013 WL 4599903, at *8 ("For a misrepresentation to be actionable under the Sherman Act it must be combined with a coercive enforcement mechanism."). We first consider whether IET has pled Illumina made false statements, then consider whether IET alleges Illumina had enforcement mechanisms to restrain trade as a result of the misstatements.

IET argues Illumina did not have the right to impose any licensing fees for operating software on its used sequencing units, as the first sale doctrine dictates that "Illumina does not actually own the license that it threatens to charge a fee for." (Resp. at 10.) The first sale doctrine allows the purchaser of copyrighted material to transfer the work without the copyright owner's permission. 17 U.S.C. § 109(a) ("[T]he owner of a particular copy . . . lawfully made under this title . . . is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy . . . ."). The first sale doctrine, however, does not apply when the copyright holder merely licenses instead of sells copyrighted software. *Id.* ¶ 109(d); *see AB SCIEX LLC*, 2013 WL 4599903, at *6 (finding first sale doctrine did not apply because plaintiff admitted defendant only licensed the operating software of its machines to purchasers) (citing *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1155 (9th Cir. 2011) ("[T]he first sale doctrine does not apply to a licensee.")).

Accordingly, at the heart of whether Illumina could legally charge licensing fees at all is whether Illumina licensed or sold the operating software for its sequencing units: if Illumina sold

the software, the first sale doctrine applies, and any representations Illumina made about the right to impose a site licensing fee for purchasers of used Illumina sequencing units would be necessarily false and misleading. Whether a software user is a licensee instead of an owner of a copy of the software requires a fact-intensive inquiry into the terms of the original transfer from the copyright owner to the first user, including whether the transfer specified that the user was only granted a license, whether the transfer had significant use restrictions, and whether the transfer restricted the user's ability to transfer the software in the future. *See Vernor v. Autodesk, Inc.*, 621 F.3d 1102, 1111–12 (9th Cir. 2010). Viewing the pleadings in IET's favor, we find Illumina could have sold the software subject to the first use doctrine to purchasers of new Illumina sequencing units, and that any threats to charge a licensing fees to purchasers of used units could constitute misrepresentations.

Furthermore, IET sufficiently pled that Illumina made false statements about its ability to charge licensing fees for specific units that were allegedly subject to a licensing fee waiver. Specifically, IET alleges Illumina previously entered into an agreement with DLL that any Illumina equipment owned or leased by DLL would not be subject to a relicensing fee from Illumina if a DLL unit is resold to a new customer. (*Id.* ¶ 21.) IET claims that Illumina has "repeatedly" threatened IET's customers with the site licensing fee (and will threaten to withhold service equipment if the fee is unpaid) even though the used Illumina sequencing units at issue were subject to the DLL agreement. (*Id.* ¶¶ 21–22; 32 (calling Illumina's threats "false" in these instances).)

Having established that Illumina's statements about the ability to charge licensing fees could be false, we also find IET has alleged sufficient "enforcement mechanisms" to make these falsehoods actionable in antitrust law. *Sanderson v. Culligan Int'l Co.*, 415 F.3d 620, 623

(7th Cir. 2005). IET avers Illumina refuses to service, sell related consumables, or sell replacement parts for its used sequencing units if they were sold or leased by IET or another third-party. (*Id.* ¶¶ 8, 10.) Specifically, IET claims Illumina deems these customers to be unauthorized users without a "'proper' software license." (*Id.*) In the instances Illumina is willing to service or sell needed parts or equipment to unauthorized users, IET avers Illumina charges "exorbitant markups." (*Id.* ¶ 32.) According to IET, Illumina's refusals are particularly powerful considering no other manufacturer's replacement parts are compatible with used Illumina sequencing units, and "Illumina is the only company that services Illumina equipment." (*Id.* ¶¶ 4, 8.) Finally, IET claims that since March 2018, Illumina has adopted a policy that it will not support or in some cases relicense software for used Illumina equipment sold by IET or other third-parties, which "is making sales of those units by resellers impossible." (*Id.* ¶ 10.)

Considering these allegations, we find IET has pled Illumina possesses sufficient enforcement mechanisms to harm competition in the relevant markets. *See Nexstar Broad., Inc. v. Granite Broad. Corp.*, No. 1:11 C 249 RM, 2012 WL 2838547, at *7 (N.D. Ind. July 9, 2012) ("Whether [defendant]'s alleged derogatory or disparaging statements are actionable in antitrust depends on the nature of the speech (who it made the statements to and what it said), and whether there was an 'enforcement mechanism' in place—whether [defendant]'s statements were backed by any sort of coercive conduct or threat (*i.e.*, the ability to boycott, to enter into agreements not to advertise certain products, or an inherent authority that it could leverage to compel advertisers to deal exclusively with [defendant].");  *cf. Sanderson*, 415 F.3d at 623 (finding no unfair tactics under the Sherman Act for defendant's false statements made about plaintiff, noting the lack of an "enforcement mechanism" paired with the alleged falsehoods). Specifically, Illumina can threaten to never service a used Illumina sequencing unit

purchased from IET or another reseller if the customer does not pay the threatened licensing fee, or refuse to sell the consumer sequencing unit consumables or replacement parts needed to keep the machine operational. These threats combined with the alleged misrepresentations about Illumina's ability to charge site licensing fees could drive all customers to Illumina and result in IET's exclusion from the marketplace of used sequencing units. (Resp. at 12 (noting Illumina's statements about licensing will ultimately limit the available resellers of used sequencing units and allow Illumina to increase prices).) *Cf. Briggs & Stratton Corp. v. Kohler Co*., 405 F. Supp. 2d 986, 990 (W.D. Wis. 2005) (finding misstatements alone without further mechanisms that did not "otherwise exclude [the party] from the market" and were thus insufficient to establish predatory conduct under the Sherman Act). We find IET's pleadings about Illumina's allegedly false statements are sufficient to survive a motion to dismiss, and need not consider IET's other claims about Illumina's allegedly predatory behavior.

### B. Specific Intent to Monopolize

Next, Illumina argues IET has failed to allege an intent to achieve a monopoly. (Mem. at 9–10.) In attempted monopolization claims, "[s]pecific intent may be inferred from predatory conduct." *Great Escape, Inc. v. Union City Body Co*., 791 F.2d 532, 541 (7th Cir. 1986) (analyzing appeal of an order granting defendants summary judgment); *see also Viamedia, Inc. v. Comcast Corp*., 218 F. Supp. 3d 674, 687 n.6 (N.D. Ill. 2016) (noting that courts often infer intent from predatory behavior for purposes of a Rule 12(b)(6) motion to dismiss monopolization and attempted monopolization claims); *DSM Desotech Inc. v. 3D Sys. Corp*., No. 08 C 1531, 2009 WL 174989, at *10 (N.D. Ill. Jan. 26, 2009) ("Although the specific intent requirement is consistently listed in the Seventh Circuit as a separate inquiry from the predatory conduct element, the same evidence that is used to prove predatory conduct often

establishes specific intent as well.").  As established above, IET has sufficiently alleged anticompetitive conduct; accordingly, we infer specific intent from the same allegations for the purposes of this motion.

### C.  Dangerous Probability of Achieving Monopoly Power

Next, Illumina argues IET has not alleged a dangerous probability of achieving a monopoly in the two alleged markets.  A dangerous probability of establishing a monopoly in a market requires more than allegations of mere "unfair or predatory conduct"; instead, "the antitrust plaintiff must also prove the defendant has market power in a relevant market" and that the "market power will tend to approach monopoly power if the alleged unlawful conduct remains unchecked."  *Walter Kidde Portable Equip., Inc. v. Universal Sec. Instruments, Inc.*, 669 F. Supp. 2d 895, 900–01 (N.D. Ill. 2009) (citing *Spectrum Sports*, 506 U.S. at 457, 113 S. Ct. at 891; *DSM Desotech Inc. v. 3D Sys. Corp.*, No. 08 C 1531, 2009 WL 174989, at *7 (N.D. Ill. Jan. 26, 2009)).  Courts regularly find pleading the defendant's share of the relevant market sufficient to allege this element at the pleading stage.  *Walter Kidde*, 669 F. Supp. 2d at 901; *see also Avnet, Inc. v. Motio, Inc.*, No. 12 C 2100, 2015 WL 425442, at *6 (N.D. Ill. Jan. 30, 2015) (finding an allegation that defendant controlled ninety-five percent of a market sufficient to survive a motion to dismiss); *Hon Hai Precision Indus.*, 2009 WL 310890, at *3 (dismissing attempted monopolization claim under the Sherman Act for failure to plead dangerous probability of achieving a monopoly, noting that "the extent of [defendant]'s worldwide share in the relevant market . . . would allow the Court to infer that [defendant] threatens or even has the capacity to obtain monopoly power").  Lack of "competition in the relevant market" also suggests a dangerous probability of establishing a monopoly.  *Hon Hai Precision Indus*, 2009 WL 310890, at *3.

We previously dismissed IET's attempted monopolization claims after finding IET had failed to identify any non-conclusory facts demonstrating Illumina's market power in the relevant markets. (Order at 6.) Illumina presently argues the new statistics IET included in its second amended complaint still fail to establish Illumina's power in the relevant markets. (Mem. at 7.) IET states that based on figures from 2016, Illumina maintains a market share between sixty-three and sixty-seven percent in the secondary resale market of refurbished sequencing units. (2d Am. Compl. ¶¶ 20, 33.) IET alleges Illumina has an even higher market share in the used Illumina unit market, and that fewer than five companies in the United States and Canada sell used Illumina units. (*Id.* ¶ 11.) Specifically, IET claims Illumina's market share in the used Illumina unit market is higher because Thermo Fisher Scientific, which has a twenty-four percent market share in the used unit market generally, does not resell Illumina sequencing units. (*Id.* ¶ 20.) We find the pleading of specific percentage of market share of sixty-three and sixty-seven percent, which is allegedly even higher for the used Illumina sequencing unit market, sufficiently establishes probability of achieving monopoly power at this stage. (*Id.* ¶ 20.) *See, e.g.*, *Walter Kidde*, 669 F. Supp. 2d at 902 (finding plaintiff's allegations defendant controlled sixty-five percent of the market to be "sufficient" at pleading stage to establish market share); *Am. Tobacco Co. v. United States*, 328 U.S. 781, 797, 66 S. Ct. 1125, 1133 (1945) (describing a company's control of over two-thirds of the cigarette market to constitute a substantial monopoly); *see also Endsley v. City of Chi.*, 230 F.3d 276, 282 (7th Cir. 2000) (explaining that "frequently, questions of whether the defendant possessed the requisite market power to establish a monopoly are addressed on a motion for summary judgment or [at] trial").

Illumina seemingly misconstrues IET's statistics, arguing "IET does not allege that Illumina *sold* 63% of the genome sequencing systems in this putative relevant market," but "[i]nstead, this alleged 63% figure apparently reflects the share of resold genome sequencing systems *manufactured* by Illumina." (Mem. at 7.) While we agree this would be an important distinction, the relevant language of the second amended complaint discusses percentages of revenue from the sale of used sequencing units, not unit manufacturers. For example, IET pulls the sixty-three to sixty-seven percent figures from the "2016 total global" and "U.S. market share" of "market revenue for refurbished genome sequencing systems." (2d Am. Compl. ¶ 20.) IET clearly is referring to each company's percentage of total revenue from the sale of refurbished sequencing units, not the manufacturer of the units themselves.

Finally, Illumina argues that IET's acknowledgment of the existence of competitors in the used sequencing unit market "suggests Illumina does not have a dangerous proximity of monopoly power." (Mem. at 8 (citing Order at 7).) As mentioned above, IET states that other third parties resell Illumina's used sequencing units, including Certified Gene Tool, Carmet Scientific, and some sellers on E-Bay. (2d Am. Compl. ¶ 33.) However, especially when paired with Illumina's alleged market share, the mere existence of a small number of competitors in the relevant markets is not "fatal" to IET on this element. (Mem. at 8.) *See Walter Kidde*, 669 F. Supp. 2d at 902 (finding the existence of three "main competitors" in the relevant market combined with defendant's alleged sixty-five percent market share to be sufficient to state a claim at the pleading stage).

Accordingly, based on the pleadings, IET has sufficiently alleged that Illumina "had sufficient market power to have been able to create a monopoly." *Endsley*, 230 F.3d at 282 (citing *Hennessy Indus. Inc. v. FMC Corp.*, 779 F.2d 402, 405 (7th Cir. 1985)).

### D. Antitrust Injury

Finally, Illumina argues IET's antitrust claims must be dismissed because IET has failed to plead an alleged antitrust injury. (Mem. at 9; Reply (Dkt. No. 61) at 7–8.) Antitrust injury is a threshold requirement for private antitrust plaintiffs; the parties do not dispute that IET must plead an antitrust injury. (Reply at 7–8; Resp. at 13–14.) *See United States ex rel. Blaum v. Triad Isotopes, Inc.*, 104 F. Supp. 3d 901, 925 (N.D. Ill. 2015) (discussing the "amorphous presence" of antitrust injury in "antitrust jurisprudence"). Antitrust injury is also a requisite element of a claim pursuant to §§ 4 and 16 of the Clayton Act. 15 U.S.C. § 15(a) ("[A]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . ."); *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334, 110 S. Ct. 1884, 1889 (1990). To prove an antitrust injury, plaintiff must show the injury is "the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Atl. Richfield Co.*, 495 U.S. at 334, 110 S. Ct. at 1889 (internal citation omitted). In other words, "a private plaintiff must show antitrust injury—which is to say, injury by reason of those things that make the practice unlawful, such as reduced output and higher price." *U.S. Gypsum Co. v. Ind. Gas Co.*, 350 F.3d 623, 626–27 (7th Cir. 2003).

IET alleges it has suffered a number of injuries as the result of Illumina's alleged anticompetitive behavior, namely lost "actual and potential" sales of used sequencing units. (2d Am. Compl. ¶¶ 9, 11, 23–24, 45.) We agree with IET that its losses could "stem from the 'competition-reducing aspect' of Illumina's behavior." (Resp. at 14 (citing *Atl. Richfield Co.*, 495 U.S. at 344, 110 S. Ct. at 1894) (emphasis removed).) This is because IET is not merely complaining about lost sales due to competition. Instead, IET alleges that Illumina's alleged predatory behavior is driving all third-party sequencing unit resellers out of the relevant markets,

and as competition is eliminated, Illumina will raise prices, which will harm the consumer. (Resp. at 13–14.) *Cf. Ehredt Underground, Inc. v. Commonwealth Edison Co.,* 90 F.3d 238, 240 (7th Cir. 1996) ("[W]e stress that antitrust is designed to protect consumers from producers, not to protect producers from each other or to ensure that one firm gets more of the business."); *Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471 (7th Cir. 1992) ("[T]he plaintiff's complaint is too much competition (injuring producers) rather than too little (injuring consumers). Entertaining claims of excessive competition would undermine the functions of the antitrust laws."). Accordingly, IET has sufficiently pled an antitrust injury as it claims its lost sales are due to Illumina's attempt to establish market power.

*     *     *

As IET has sufficiently plead the required elements to support an attempted monopolization claim under the Sherman Act, we deny Illumina's motion to dismiss IET's attempted monopolization claims (Counts I, II, and V).

## II.    ICFA AND UDTPA CLAIMS (COUNTS III & IV)

Finally, we consider IET's state law fraud claims. Illumina argues we must dismiss these claims because (1) IET did not allege it lost sales to Illinois customers and (2) none of Illumina's alleged misrepresentations "fall[] within the purview of the UDTPA." (Mem. at 13.)

### A.  Geographic Nexus to Illinois

As established in our previous order, both the ICFA and UDTPA have a limited reach outside of Illinois. (Order at 9.) *See Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 185, 835 N.E.2d 801, 853 (Ill. 2005) (holding the ICFA does not "apply to fraudulent transactions which take place outside of Illinois"); *see also LG Elecs. U.S.A.,*

*Inc. v. Whirlpool Corp.*, 809 F. Supp. 2d 857, 859 (N.D. Ill. 2011) ("The Court concludes that the rule in *Avery* applies to the []UDTPA.").

To qualify as sufficiently "within Illinois" to bring a claim under the ICFA or UDTPA, a plaintiff must allege "circumstances that relate to the disputed transaction occur primarily and substantially in Illinois." *Avery*, 216 Ill. 2d at 187, 835 N.E.2d at 853. "[T]here is no single formula or bright-line test for determining whether a transaction occurs within [Illinois]"; instead, "each case must be decided on its own facts." *Id.* Relevant factors include "(1) the claimant's residence; (2) the defendant's place of business; (3) the location of the relevant item that is the subject of the disputed transaction; (4) the location of the claimant's contacts with the defendant; (5) where the contracts at issue were executed; (6) the contract's choice of law provisions . . . ; (7) where the allegedly deceptive statements were made; (8) where payments for services were to be sent; and (9) where complaints about the goods or services were to be directed." *Haught v. Motorola Mobility, Inc.*, No. 12 C 2515, 2012 WL 3643831, at *3 (N.D. Ill. Aug. 23, 2012).

We previously dismissed IET's state fraud claims because we found IET failed to plead facts sufficiently connecting Illumina's actions to the state of Illinois. (Order at 10 (finding IET maintaining its principal place of business in Illinois to be an insufficient connection to Illinois).) In its second amended complaint, IET adds a list of four potential customers in Illinois that IET allegedly lost because of Illumina's conduct.[5] (2d Am. Compl. ¶ 45.) Illumina argues we should

---

[5] IET alleges "Illumina's conduct has resulted in lost sales of preowned Illumina equipment to the following Illinois customers dating back to 2010": (1) the University of Chicago in Chicago, Illinois; (2) Tempus in Chicago, Illinois; (3) Argon National Laboratory in Argon, Illinois; and (4) ACGT Inc. in Wheeling, Illinois. (2d Am. Compl. ¶ 45.) IET alleges it lost two separate sales of Illumina GA2X systems to the University of Chicago. (*Id.*)

again find IET failed to sufficiently allege the requisite nexus to Illinois to proceed under the ICFA or UDTPA. (Mem. at 13.)

IET pleads two essential factors that create a connection to Illinois: IET being an Illinois corporation with its principal place of business in Mundelein, Illinois, and five sales IET alleges it lost from four potential customers in Illinois. (2d Am. Compl. ¶¶ 13, 45.) A plaintiff's injury in Illinois combined with specifically-identified lost sales to customers in the state sufficiently establishes a nexus to Illinois at the pleading stage. *AB SCIEX, LLC*, 2013 WL 4599903, at *11 (finding plaintiff sufficiently pled a nexus to Illinois on ICFA and UDTPA claims based on plaintiff's incorporation and primary place of business in Illinois combined with lost sales to three customers in Illinois); *cf. Walker v. S.W.I.F.T. SCRL*, 491 F. Supp. 2d 781, 795 (N.D. Ill. 2007) (finding no substantial connection to Illinois when only tie is plaintiff's residence in Illinois, noting specifically that none of the parties' interactions or transactions occurred in Illinois).

### B. Scope of the UDTPA

Finally, Illumina argues IET's UDTPA claim should be dismissed because none of Illumina's alleged actions fall under the scope of the Illinois statute. (Mem. at 14–15.) To succeed on a UDTPA claim, IET must show Illumina "engaged in one of the types of deceptive conduct enumerated in the statute." *Patel v. Zillow, Inc.*, No. 17 C 4008, 2018 WL 2096453, at *4 (N.D. Ill. May 7, 2018) (slip op.), *appeal filed*, No. 18-21330 (7th Cir. May 21, 2018). IET claims Illumina's alleged behavior falls under two categories of prohibited activities listed in § 2 of the UDTPA. (2d Am. Compl. ¶¶ 40–46.) Section 2 defines "deceptive trade practice[s]" to include a person who "in the course of his or her business, vocation, or occupation . . . (11) makes false or misleading statements of fact concerning the

reasons for, existence of, or amounts of price reductions; [or] (12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding." 815 ILCS 510/2(a)(11)–(12).  Illumina argues that its alleged behavior falls outside the scope of these subsections.

Illumina argues none of IET's allegations could fall under subsection 12 because none of its alleged behaviors involve confusion related to the use of a "deceptive trade name, trademark, or other distinctive symbol."  (Mem. at 14–15 (citing *ATC Healthcare Servs., Inc. v. RCM Techs., Inc.*, 192 F. Supp. 3d 943, 953 (N.D. Ill. 2016)).)  IET correctly observes in response that subsection 12 is given broad interpretation.  *Chi.'s Pizza, Inc. v. Chi.'s Pizza Franchise Ltd. USA*, 384 Ill. App. 3d 849, 868, 893 N.E.2d 981, 998 (1st. Dist. 2008).  However, The Seventh Circuit has clarified that "likelihood of confusion" under the UDTPA has the same meaning as in "traditional infringement cases."  *McGraw-Edison Co. v. Walt Disney Prods.,* 787 F.2d 1163, 1174 (7th Cir. 1986).  In trademark infringement law, "'likelihood of confusion' exists when the defendant's use of a deceptive trade name, trademark, or other distinctive symbol is likely to confuse or mislead consumers as to the source or origin of the product or service."  *ATC Healthcare Servs.*, 192 F. Supp. 3d at 953.

Here, IET has not alleged any behavior by Illumina that suggests Illumina used any sort of trademark or trade symbol of IET, and IET does not claim Illumina ever misled customers about the source of relevant sequencing units.  We thus agree that IET has failed to meet the requirement of subsection 12.  *Id.* (dismissing claim under UDTPA subsection 12 because plaintiff did not allege defendant "tried to pass of its services as those of [plaintiff]," and because there was no confusion which company was contacting

customers); *Lorillard Tobacco Co. v. Elston Self Serv. Wholesale Groceries, Inc.*,

No. 03 C 4753, 2009 WL 1635735, at *5 (N.D. Ill. June 9, 2009) ("The concern over 'a

likelihood of confusion or misunderstanding' in the Deceptive Practices Act is the same

as that in trademark infringement cases. The focus is whether there is a likelihood of

confusion over the *origin* of the product.") (internal citation omitted).

We do find, however, that IET's allegations could fit subsection 11. There is scant case

law interpreting "price reduction" under the UDTPA; however, Illinois courts have directed the

UDTPA is to be given broad interpretation. *Duhl v. Nash Realty Inc.*, 102 Ill. App. 3d 483, 495,

429 N.E.2d 1267, 1277 (1st Dist. 1981) ("There is a clear mandate from the Illinois legislature

that the courts of this State utilize the Act to the utmost degree in eradicating all forms of

deceptive and unfair business practices and grant appropriate remedies to injured parties.").

Illumina argues that IET does not plead any behavior of Illumina that falls under subsection 11

because IET claims Illumina made false statements regarding "Illumina's ability to charge

software relicensing fees," statements Illumina claims are not related to "price reductions."

(Mem. at 14.)

However, we agree with IET that Illumina's alleged behaviors could fall within the scope

of subsection 11 if we consider the total price of a used Illumina unit to include both its price and

the cost of its operating software. IET argues Illumina made false or misleading statements

about Illumina's ability to charge software licensing fees for used Illumina sequencing units, and

that a customer would not be subject to this fee should they purchase a used Illumina unit

directly from Illumina. (2d Am. Compl. ¶¶ 5–6.) When considering the total price of a unit, the

result of Illumina's threatened licensing fee is a lower total cost of a used Illumina sequencing

unit if purchased from Illumina instead of IET. If Illumina did not have the right to charge this

software licensing fee, this could constitute a false or misleading statement about its ability to offer a reduced price for the same equipment. Accordingly, making all inferences in IET's favor, we find IET's allegations could state a violation of subsection 11, and accordingly deny Illumina's motion to dismiss Count IV.

## CONCLUSION

For the aforementioned reasons, we hereby deny Illumina's motion to dismiss. Illumina shall file its answer to IET's second amended complaint on or before September 12, 2018. The principal attorneys for Illumina and IET shall appear before the Court with an agreed written discovery plan at the Court's status call on October 18, 2018 at 10:30 a.m. It is so ordered.

_____
Marvin E. Aspen
United States District Judge

Dated: August 14, 2018
        Chicago, Illinois