**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| INTERNATIONAL EQUIPMENT TRADING, LTD., an Illinois corporation, | ) ) | No. 1:17-cv-05010 |
| | ) | Honorable Marvin E. Aspen |
| Plaintiff, | ) | |
| | ) | Magistrate Judge M. David |
| v. | ) | Weisman |
| | ) | |
| ILLUMINA, INC. | ) | |
| | ) | |
| Defendant. | ) | |

**ANSWER AND AMENDED AFFIRMATIVE DEFENSES OF ILLUMINA, INC. TO THE
SECOND AMENDED COMPLAINT OF INTERNATIONAL EQUIPMENT TRADING,
LTD. AND COUNTERCLAIMS OF ILLUMINA, INC.**

Defendant Illumina, Inc. ("Illumina") answers the Second Amended Complaint ("SAC")

of Plaintiff International Equipment Trading, Ltd. ("IET") and counterclaims as follows:[1]

**ANSWER**

Illumina denies each and every allegation in the SAC's section headings and in all

portions not contained in numbered paragraphs. Except as expressly admitted, or where Illumina

lacks knowledge or information sufficient to form a belief as to the truth of an allegation,

Illumina denies all allegations contained in the SAC.

**NATURE OF ACTION**

1.        This is an action brought pursuant to Section 2 of the Sherman Act, Sections 4
and 16 of the Clayton Act, and various state laws in order to enjoin and prevent Defendant
Illumina, Inc. ("Illumina") from continuing to engage in certain predatory and anticompetitive
business practices directed against Plaintiff, International Equipment Trading, Ltd. ("IET") and
other secondary resellers of Illumina's products. IET also seeks treble compensatory damages,
including lost profits, suffered by it as a result of Illumina's unlawful and anticompetitive
conduct.

---

[1] The Answer and Counterclaims set forth herein are identical to the Answer and Counterclaims
asserted in Illumina's Answer to IET's Second Amended Complaint, filed on September 12,
2018. *See* Dkt. No. 68. Only some of the Affirmative Defenses have been amended.

**ANSWER:** Illumina admits that the SAC alleges claims purporting to arise under Section 2 of the Sherman Act, Sections 4 and 16 of the Clayton Act, and various state laws, and that IET seeks injunctive relief and treble compensatory damages, including lost profits. To the extent the allegations of Paragraph 1 contain legal conclusions, they require no response. Illumina otherwise denies the allegations of Paragraph 1.

2.      IET is in the business of sourcing pre-owned and new analytical laboratory equipment for sale, lease, rent or trade to independent laboratories, hospitals, research institutions and universities, both within the United States, including the State of Illinois, and internationally. The laboratory equipment sourced by IET includes sequencing unit systems and required accessory instruments manufactured by Illumina, including the Model GA-2X, HiSeq 2500, HiSeq 4000, cBOT and MiSeq.

**ANSWER:** Illumina admits that it is a manufacturer of sequencing systems ("Sequencing Systems"), including the Genome Analyzer IIx, HiSeq 2500, HiSeq 4000, and MiSeq Sequencing Systems.[2] Illumina admits that it manufactured the cBOT system, but denies that the cBOT system is a Sequencing System. Illumina lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations of Paragraph 2.

3.      Illumina is a Delaware corporation with its principal place of business in San Diego, California. Illumina develops, manufactures and markets integrated systems for the analysis of genetic variation and biological function. Illumina provides a line of products and services that serve the sequencing, genotyping and gene expression markets. Its customers include genomic research centers, pharmaceutical companies, academic institutions, clinical research organizations and biotechnology companies.

**ANSWER:** Illumina admits that it is a Delaware corporation with a principal place of business in San Diego, California. Illumina otherwise denies the allegations of the first sentence of Paragraph 3. Illumina admits the remaining allegations of Paragraph 3.

4.      Because Illumina sells its own equipment – both refurbished and new – it is a competitor of IET. However, because there are also repair and service elements to any sale or

---

[2] The term "Sequencing Systems" as used in herein includes only the hardware on the Sequencing Systems.

2

lease of Illumina's equipment, IET regularly brokers service contracts between Illumina and IET's customers. Illumina is the only company that services Illumina equipment.

**ANSWER:** Illumina admits that it sells its own equipment, both refurbished and new. IET's allegation that Illumina is a competitor of IET is a legal conclusion to which no response is required; Illumina otherwise lacks information or knowledge sufficient to form a belief as to the truth of the allegation. Illumina admits that it sometimes enters into service contracts with customers purchasing or leasing Illumina equipment. Illumina denies the remaining allegations of Paragraph 4.

5. Beginning in or around 2007 and continuing up to and including the date of filing this Second Amended Complaint, Illumina has been engaged in a practice of threatening IET's customers with what it calls, depending on the model, a $90,000 "site licensing fee" for the operating and data collection software necessary to operate its sequencing units once Illumina learns of a potential sale or lease by IET of one of Illumina's refurbished systems. Illumina, pursuant to its policy and practice, advises the customer that unless the customer buys or leases a new or used sequencing unit directly from Illumina, the software on the used instrument is subject to a non-transferable software license, and therefore, subject to a "site licensing fee." Illumina's practices have extended to other third-party resellers of Illumina's sequencing units in addition to IET.

**ANSWER:** Illumina admits that it quotes software relicensing fees to potential buyers or users of preowned Illumina Sequencing Systems being sold by third-party resellers. Illumina further admits that such Sequencing Systems contain operating and data collection software that is subject to a nontransferable Illumina software license and that is necessary to operate the Sequencing Systems. Illumina further admits that the software relicensing fees vary depending on the Sequencing System model. Illumina lacks information or knowledge sufficient to form a belief as to the truth of the allegation that the customers to which it has quoted such software relicensing fees are "IET's customers" or that such fees are referred to as "site licensing fees." Illumina denies the remaining allegations of Paragraph 5.

6. For its model HiSeq 2500, Illumina generally demands a $70,000 site license fee. For the HiSeq 4000, Illumina generally demands a $90,000 site license fee. For the cBOT, Illumina generally demands a $6,000 site license fee. Despite Illumina's characterization of the operating and data collection software as being "licensed," Illumina actually sells the software as part of its sale of a new sequencing unit. The software is sold for a single, up-front payment with

no recurring benefit to Illumina, and the "Software License Agreement" accompanying such sales is of perpetual duration and never requires the purchasers of such software to return or destroy the software unless the agreement is terminated by Illumina.

**ANSWER:** Illumina admits that, for its model HiSeq 2500, Illumina's standard software relicensing fee is $70,000. Illumina admits that, for its model HiSeq 4000, Illumina's standard software relicensing fee is $90,000. Illumina admits that, for its cBOT, Illumina's standard software relicensing fee is $6,000. The allegations of the fourth sentence of Paragraph 6 consist of legal conclusions to which no response is required; Illumina otherwise denies the allegations of the fourth sentence of Paragraph 6. Illumina admits that software licensing agreements accompany its sales of *Sequencing Systems* and states that those agreements speak for themselves. Illumina denies the remaining allegations of Paragraph 6.

7.      The "site licensing fee" is not, in reality, a mandatory fee and the threat of imposing the fee upon IET's customers is intended to kill the sale or lease between the customer and IET. The amount of the fee, or whether to charge it at all, is discretionary on the part of Illumina's regional sales representatives or service engineers, and both the imposition and the amount of the fee are arbitrary and solely intended to interfere with sales or leases of Illumina's own products on the secondary market. Illumina has repeatedly threatened customers in the secondary market to charge the $90,000 licensing fee only with regard to sequencing units purchased from third party resellers like IET.

**ANSWER:** Illumina admits that certain employees at Illumina have the authority to discount the amount of the software relicensing fee. Illumina admits that it has quoted software relicensing fees to potential buyers or users of preowned Illumina Sequencing Systems being sold by third-party resellers. Illumina denies the remaining allegations of Paragraph 7.

8.      In some instances, Illumina has also refused to service preowned equipment purchased by a customer from IET or from other third parties, or to sell reagents or other parts to that customer without what it deems to be a "proper" software license, refusing to recognize those customers as "authorized users." Consumers in need of replacement parts have no choice but to give in to Illumina's threats because no other manufacturer's replacement parts are compatible with Illumina machines or interchangeable with Illumina parts.

**ANSWER:** Illumina admits that it has refused to service Illumina equipment or sell reagents or parts to customers if they have not paid applicable software relicensing fees for use

of the software on the equipment. Illumina lacks information or knowledge sufficient to form a belief as to the truth of the allegations that any such customers are customers of IET or other third parties, and that no other manufacturer's replacement parts are compatible with Illumina machines or interchangeable with Illumina parts. Illumina denies the remaining allegations of Paragraph 8.

9.       These "scare tactics" utilized by Illumina, insofar as they impact IET's profits, typically have the effect of quelling IET's sales of sequencing units to its customers or potential customers, sometimes in favor of sales of either refurbished or new equipment by Illumina itself.

**ANSWER:**       Illumina denies the allegation that Illumina's quoting of software relicensing fees is a "scare tactic" utilized by Illumina. Illumina lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations of the first sentence of Paragraph 9.

10.       Most recently, in March 2018, Illumina announced a "policy regarding the resale and support" of its HiSeq X instruments, stating that Illumina does not intend to support any such instruments being offered for resale to U.S. customers, including providing de-installation/re-installation services, entering into new service contracts, providing on-demand repairs, providing technical support, relicensing the Illumina software on the instruments, and/or the sale of related consumables. Thus, Illumina has in some instances refused to service or relicense the software for these preowned Illumina systems, even for a fee. If, in fact, Illumina is now refusing to service any of its preowned systems sold by third-party resellers entirely, it is making sales of those units by resellers impossible, eliminating the secondary market for its own systems, entirely.

**ANSWER:**       To the extent the allegations of Paragraph 10 contain legal conclusions, they require no response. Illumina admits the allegations of the second sentence of paragraph 10. Illumina otherwise denies the allegations of Paragraph 10.

11.        By its predatory and discriminatory threats and conduct, Illumina has unlawfully attempted to create a monopoly within the secondary sequencing unit market, or alternatively, within the sub-market consisting of its own sequencing units, by effectively prohibiting the resale of its own products by IET or any other third-party reseller, thereby eliminating, or attempting to eliminate, IET and any other resellers of sequencing units as competitors of Illumina in the secondary resale market.

**ANSWER:**       Illumina denies the allegations of Paragraph 11.

5

## JURISDICTION, VENUE AND COMMERCE

12.     The jurisdiction of this Court is involved pursuant to 28 U.S.C. § 1331 and §1337(a) because this action is brought pursuant to Section 2 of the Sherman Act, 15 U.S.C. § 2, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a), 26.

**ANSWER:**     Paragraph 12 consists of legal conclusions to which no response is required; Illumina otherwise denies the allegations of Paragraph 12.

13.     The Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on diversity of citizenship:

> a. IET is an Illinois corporation with its principal place of business in Mundelein, Illinois.  Therefore, IET is a citizen of Illinois.

> b. Illumina enjoys dual citizenship with its place of incorporation in Delaware, and its principal place of business located in San Diego, California.

> c. The amount in controversy exceeds $75,000, exclusive of interest and costs.

**ANSWER:**     To the extent the allegations of Paragraph 13 contain legal conclusions, they require no response.  Illumina admits that it is a Delaware corporation with a principal place of business in San Diego, California.  Illumina otherwise denies the allegations of subparagraph b of Paragraph 13.  Illumina lacks information or knowledge sufficient to form a belief as to the truth of the allegations regarding IET.  Illumina otherwise denies the allegations of Paragraph 13.

14.     This Court also has supplemental jurisdiction over IET's state and common law claims under 28 U.S.C. § 1367 because those claims are so related to the federal claims that they form part of the same case or controversy and involve a common nucleus of operative fact.  The exercise of supplemental jurisdiction avoids unnecessary duplication and multiplicity of actions and is in the interests of judicial economy, convenience, and fairness.

**ANSWER:**     Paragraph 14 consists of legal conclusions to which no response is required; Illumina otherwise denies the allegations of Paragraph 14.

15.     Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to this cause of action occurred in Lake County, Illinois, and because Defendants transact business within this district.  See also 28 U.S.C. § 93(a)(1) (Northern District of Illinois comprises Lake County).

**ANSWER:** Paragraph 15 consists of legal conclusions to which no response is required; Illumina otherwise denies the allegations of Paragraph 15.

## FACTS COMMON TO ALL COUNTS

### *Relevant Markets of Genome Sequencing Units*

16. A distinct market exists for used genome sequencing units. First, new and used sequencing units are not easily interchangeable with one another because of the enormous price differential between new and used models. The difference in price between a new and used sequencing unit sequencing unit of the same model can be up to five hundred thousand dollars. For many consumers who are in the market to purchase a used instrument, paying the premium price for a new instrument is simply not an alternative.

**ANSWER:** The allegations of the first sentence of paragraph 16 consist of legal conclusions to which no response is required; Illumina otherwise denies the allegations of the first sentence of Paragraph 16. The allegations of the second sentence of paragraph 16 consist of legal conclusions to which no response is required; Illumina otherwise lacks information or knowledge sufficient to form a belief as to the truth of the allegations of the second sentence of Paragraph 16. Illumina lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations of Paragraph 16.

17. Further, the purchase of a sequencing unit represents a significant investment for the purchaser. In addition to the high purchase price and servicing costs, a purchaser of a sequencing unit must invest significant amounts of time and resources into validating operating platforms and developing methods and procedures for use in particular applications.

**ANSWER:** Illumina lacks information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 17.

18. With regard to Illumina sequencing units specifically, the processes of platform validation and development of methodology involve steep learning curves, and cannot be transferred or applied to other manufacturers' sequencing units. Thus, a consumer who has already established platforms and procedures for an Illumina sequencing unit will find it very difficult to change to a different manufacturer, or to add a non-Illumina machine to their collection of sequencing units. Additionally, many customers of contract research organizations insist that their samples be processed only by Illumina standardized equipment, due in large part to their sensitivity. Other customers require an Illumina machine because they have already developed their protocols on Illumina platforms. For these organizations, use of another

manufacturer's instruments is not an option.  Finally, replacement parts and servicing for Illumina sequencing units are not interchangeable with those of other manufacturers' machines.  Thus, consumers in the market for an Illumina sequencing unit will not be able to easily substitute another manufacturer's instrument.

**ANSWER:**    To the extent the allegations of Paragraph 18 contain legal conclusions,

they require no response.  Illumina otherwise lacks information or knowledge sufficient to form

a belief as to the truth of the allegations of Paragraph 18.

19.    Illumina reportedly controls between approximately 71-75% of the overall genome sequencing market (both new and used instruments), and is predicted to control a substantially higher percentage of the sequencing market by 2023.  In 2017, the total gross sales of all genome sequencing units was approximately $3.2 billion, of which Illumina reported sales revenues of $2.3 billion.

**ANSWER:**    To the extent the allegations of Paragraph 19 contain legal conclusions,

they require no response.  Illumina denies the allegations of Illumina's "reported sales revenues"

in the second sentence of Paragraph 19.  Illumina otherwise lacks information or knowledge

sufficient to form a belief as to the truth of the allegations of Paragraph 19.

20.    On information and belief, the 2016 total global market revenue for refurbished genome sequencing systems was approximately $41,570,000 million, broken down as follows: (1) Illumina – 63%, (2) Thermo Fisher Scientific, Inc. – 24%, and (3) Others – 13%.  On information and belief, the 2016 U.S. market share for refurbished genome sequencing systems was 67% for Illumina, 22% for Thermo Fisher Scientific, Inc., and 11% for Others, with higher projections for Illumina's U.S. market share for 2018.  Based on these figures, it is believed that Illumina's market share in the refurbished sequencing unit submarket consisting of preowned Illumina instruments is far greater, and is approaching dominance, since other manufacturers of genome sequencing systems like Thermo Fisher Scientific, Inc. do not sell Illumina's refurbished systems.

**ANSWER:**    To the extent the allegations of Paragraph 20 contain legal conclusions,

they require no response.  Illumina otherwise lacks information or knowledge sufficient to form

a belief as to the truth of the allegations of Paragraph 20.

### *Lost Sales Regarding Instruments Expressly Exempt From Licensing Fees Under DLL Agreement*

21.    De Lage Landen Financial Services, Inc. ("DLL") provides lease or other financing of Illumina instruments and systems, many of which were sold to DLL by Illumina. On

information and belief, Illumina entered into an agreement with DLL, pursuant to which those parties agreed that any Illumina equipment owned or leased by DLL is not subject to a re-licensing fee from Illumina for a new customer ("DLL Agreement"). Thus, pursuant to the DLL Agreement, Illumina consents to the transfer by third party resellers engaged by DLL to sell the formerly leased/financed Illumina systems, including IET, to their end-user customers of the software loaded on those instruments. Notwithstanding this agreed upon exemption, Illumina has repeatedly attempted to interfere with sales by threatening IET's customers with a "licensing fee." By way of example only, despite the fact that the units in question were subject to the DLL Agreement, Illumina advised representatives of Gen Era Diagnostik A.S and the Uniformed Services University of the Health Sciences that if they purchased the units used through IET, they would be required to pay the licensing fee. Further, Illumina's representatives have, on occasion, represented to potential customers that they must pay the licensing fee for equipment subject to the DLL Agreement and, on a few of those occasions, DLL's legal representatives have intervened on behalf of the potential customer.

**ANSWER:** Illumina admits the allegations of the first sentence of Paragraph 21. Illumina admits that it entered into an agreement with DLL, pursuant to which those parties agreed that, upon the expiration of a lease of Illumina equipment by DLL, "DLL solely, in conjunction with the transfer of the Equipment, may transfer the software license to a third party at the end of the [lease] term or in the event of a [lease] default and such transfer shall not be subject to a licensing fee," specifying that "title to the Equipment shall remain with DLL throughout the period of time the Equipment is being remarketed." Illumina otherwise denies the allegations in the second sentence of Paragraph 21. Illumina denies the allegations in the third sentence of Paragraph 21. Illumina admits that it has quoted software relicensing fees to potential buyers or users of preowned Illumina Sequencing Systems being sold by other third-party resellers (besides DLL), but lacks knowledge or information sufficient to form a belief as to whether such potential buyers or users were IET's customers. Illumina otherwise denies the allegations of the fourth sentence of Paragraph 21. Illumina admits that it quoted a software relicensing fee to representatives of Gen Era Diagnostik A.S and the Uniformed Services University of the Health Sciences for the units in question, but denies that those sales were subject to the DLL Agreement. Illumina lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations of the fifth sentence of Paragraph 21. Illumina

lacks knowledge or information sufficient to form a belief as to the truth of the allegations of the sixth sentence of Paragraph 21.

22.     On other occasions, despite the equipment being exempt from license fees due to the DLL Agreement, Illumina will refuse to service equipment that was subject to the DLL Agreement unless and until the customer agrees to purchase a service contract for $70,000. For example, GoPath Laboratories of Buffalo Grove, Illinois purchased a HI SEQ 2500 from IET that was subject to the DLL Agreement. After DLL eventually intervened, the customer was able to purchase the unit from IET without paying Illumina a license fee. Illumina installed the system and agreed to provide reagents – substances added to the system to cause a certain chemical reaction or test if a certain chemical reaction occurs. Despite that fact, when the system had a problem, Illumina refused to repair it unless and until GoPath purchased a $70,000 "service contract." Illumina does not typically require customers who pay the license fee to purchase a service contract. Further, since Illumina is taking the position that GoPath cannot transfer the software license, GoPath is unable to sell the instrument because if the buyer is required to pay a $70,000 licensing fee plus installation costs (estimated to be between $80,000-$90,000), these fees exceed the current market value of that system.

**ANSWER:**     Illumina denies the allegations of the first sentence of paragraph 22. Illumina admits that a HiSeq 2500 was placed with an entity named GoPath and that no software relicensing fee was paid in connection with that placement. Illumina denies that the HiSeq 2500 placed with GoPath was subject to the DLL Agreement. Illumina lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations of the second and third sentences of Paragraph 22. Illumina admits the allegations of the fourth sentence of Paragraph 22. Illumina denies the allegations of the fifth sentence of Paragraph 22. Illumina admits that it typically does not require customers to purchase service contracts; Illumina otherwise denies the allegations of the sixth sentence of Paragraph 22. Illumina lacks information or knowledge sufficient to form a belief as to the truth of the allegations of the seventh sentence of Paragraph 22.

### Additional Actual Lost Sales Resulting From Illumina's Predatory Conduct

23.     In addition to the forgoing lost sales of "exempt" instruments pursuant to the DLL Agreement, Illumina's predatory conduct has also resulted in other lost sales. For example, IET lost a sale of a HiSeq 4000 to the University of Central Florida because Illumina advised the customer that it would not service, install or sell reagents for the system unless the university paid $90,000 to Illumina for the site transfer license.

**ANSWER:** Illumina denies the allegations of the first sentence of Paragraph 23. Illumina lacks information or knowledge sufficient to form a belief as to the truth of the remaining allegations of Paragraph 23.

***Illumina's Attempted Interference With IET's Sales***

24.     Using its scare tactics directed to IET's customers, Illumina has interfered with actual and potential sales.

**ANSWER:** Illumina denies the allegations of Paragraph 24.

## COUNT I

### Violation of § 2 of Sherman Act
### (15 U.S.C. § 2 – Attempted Monopolization)

25.     IET realleges Paragraphs 1-24 as Paragraph 25 of this Count I, as though fully set forth herein.

**ANSWER:** Illumina adopts and realleges its answers to Paragraphs 1-24 of the SAC as its answer to Paragraph 25.

26.     Section 2 of the Sherman Act provides:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.  15 U.S.C. § 2.

**ANSWER:** Illumina states that the quoted statute speaks for itself.

27.     Illumina's sequencing units are marketed to and sold to customers located within the State of Illinois, throughout the United States, and the world.  Therefore, Illumina's conduct substantially affects interstate and foreign commerce.

**ANSWER:** Illumina admits the allegations of the first sentence of Paragraph 27. The second sentence of Paragraph 27 consists of a legal conclusion to which no response is required; Illumina otherwise denies the allegations of the second sentence of Paragraph 27.

28. The market for used genome sequencing units constitutes a distinct market. As compared with other types of sequencing units or with each other, the used sequencing units are not substitutable, and there is a very low cross-elasticity of demand. Further, the prohibitively high cost of new sequencing units places used machines of both of these types in their own sub-market.

**ANSWER:** To the extent the allegations of Paragraph 28 contain legal conclusions, they require no response. Illumina otherwise denies the allegations of Paragraph 28.

29. Alternatively, the market for used Illumina genome sequencing units constitutes a distinct market within the used sequencing unit market. As compared with other manufacturers' machines (new or used), used Illumina sequencing units are not easily interchangeable, and there is a very low cross-elasticity of demand between Illumina machines and those of its competitors. Further, the prohibitively high cost of new sequencing units places used Illumina machines in their own sub-market.

**ANSWER:** To the extent the allegations of Paragraph 29 contain legal conclusions, they require no response. Illumina otherwise denies the allegations of Paragraph 29.

30. In violation of Section 2 of the Sherman Act (15 U.S.C. § 2), Illumina engaged in the foregoing anticompetitive conduct in an attempt to monopolize one or more of the above used sequencing unit markets by attempting to eliminate competition from third-party resellers like IET. Such violations began in 2007 are continuing up to and including the date of filing this Complaint, and will continue unless the relief prayed for is granted.

**ANSWER:** Illumina denies the allegations of Paragraph 30.

31. By virtue of the above conduct, Illumina has demonstrated the specific intent to destroy competition or build a monopoly over the foregoing secondary sequencing unit markets.

**ANSWER:** Illumina denies the allegations of Paragraph 31.

32. Illumina's practice of threatening IET's customers with a $70,000-90,000 "site licensing fee," or lesser amounts, constitutes predatory and anticompetitive conduct. Illumina's threats are false statements because: (1) as set forth in Count VII herein, the first sale doctrine prohibited Illumina from imposing the fee, and (2) Illumina was contractually prohibited from imposing the fee in certain instances under the DLL Agreement. Instead, Illumina uses these threats as a way to drive IET and other third-party resellers from the foregoing sequencing unit

markets and thereby strengthen its dominant position within these markets. Illumina employs coercive mechanisms in tandem with its threats, including its refusal to service used equipment purchased through third-party resellers like IET, imposing exorbitant markups on replacement parts to consumers who purchase sequencing units from third-party resellers like IET or who do not enter into service contracts with Illumina, and leveraging its inherent authority as an industry leader to coerce sales away from third-party resellers like IET.

**ANSWER:** Illumina denies the allegations of Paragraph 32.

33.     Having fewer than a handful of competitors worldwide who also manufacture sequencing units, Illumina maintains a market share of approximately 71-75% in the genome sequencing unit industry generally, as well as a market share of approximately 63-67% in the secondary resale market of genome sequencing units, with a substantially greater percentage in the submarket consisting of its own sequencing systems after eliminating other manufacturers as competitors in that sub-market. Thus, the submarket of preowned Illumina sequencing systems consists of Illumina and third-party dealers.IET is one of fewer than five companies in the United States and Canada who sell Illumina's sequencing units in the secondary markets. Besides IET, other third party resellers of Illumina's units include Certified Gene Tool, Carmet Scientific, and some end-user E-bay sellers, who are believed to generate annual sales revenues of used sequencing units below that of IET (preowned genome sequencers are currently selling on E-bay for anywhere between $15,500-65,000). IET, Illumina's closest competitor in the sequencing unit resale market consisting of preowned Illumina instruments had total sales of used Illumina sequencing units of approximately $600,000 for the previous five years, or an average of $120,000 per year. Based on these facts, Illumina occupies substantial market power and dominance within the resale market for genome sequencing units, as well as in the submarket for preowned sequencers manufactured by Illumina.

**ANSWER:** To the extent the allegations of Paragraph 33 contain legal conclusions, they require no response. Illumina otherwise lacks information or knowledge sufficient to form a belief as to the truth of the allegations of Paragraph 33.

34.     Given (a) Illumina's substantial position in the market for used sequencing units, or alternatively, within the used Illumina sequencing unit submarket, (b) the breadth of adoption and expansion of its anticompetitive policies by its various sales representatives throughout the United States and internationally, and (c) the excessive cost of the "software transfer fee," health check, installation and service contract totaling between $180,000-210,000 depending on the model, coupled with Illumina's refusal to service equipment not purchased directly from them, all of which makes entry into Illumina's used sequencing market very difficult, if not impossible, a dangerous probability exists that its attempts to monopolize the secondary sequencing unit markets will succeed.

**ANSWER:** To the extent the allegations of Paragraph 34 contain legal conclusions, they require no response. Illumina otherwise denies the allegations of Paragraph 34.

13

35.     If Illumina is successful in monopolizing the foregoing sequencing unit markets, competition will be harmed because Illumina will (a) be able to inflate the price of used sequencing units in the relevant markets, and/or (b) artificially reduce the supply of used sequencing units, and/or (c) make it impossible for IET and other third party resellers to move their inventory.

**ANSWER:**     Illumina denies the allegations of Paragraph 35.

## COUNT II

### Violation of §§ 4 and 16 of Clayton Act
### (15 U.S.C. §§ 15(a), 26)

36.     IET realleges Paragraphs 1-24 and 26-35 as Paragraph 36 of this Count II, as though fully set forth herein.

**ANSWER:**     Illumina adopts and realleges its answers to Paragraphs 1-24 and 26-35 of the SAC as its answer to Paragraph 36 of the SAC.

37.     Section 4 of the Clayton Act provides, in relevant part:

"… any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee." 15 U.S.C. § 15(a).

**ANSWER:**     Illumina states that the quoted statute speaks for itself.

38.     Moreover, Section 16 of the Clayton Act provides, in relevant part:

"Any … corporation … shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws…". 15 U.S.C. § 26.

**ANSWER:**     Illumina states that the quoted statute speaks for itself.

39.     Thus, Illumina's actual and threatened violations of § 2 of the Sherman Act, as alleged in Count I herein, establishes a private right of action for IET and entitles IET to relief under Sections 4 and 16 of the Clayton Act, respectively, in the form of treble compensatory damages, costs, attorneys' fees, prejudgment interest (15 U.S.C. § 15(a)) and injunctive relief (15 U.S.C. § 26).

**ANSWER:** To the extent the allegations of Paragraph 39 contain legal conclusions, they require no response. Illumina otherwise denies the allegations of Paragraph 39.

## COUNT III

### Violation of Illinois Consumer Fraud and Deceptive Business Practices Act
### (815 ILCS 505/1 et seq.)

40. IET realleges Paragraphs 1-24, 26-35 and 37-39 as Paragraph 40 of this Count III, as though fully set forth herein.

**ANSWER:** Illumina adopts and realleges its answers to Paragraphs 1-24, 26-35 and 37-39 of the SAC as its answer to Paragraph 40 of the SAC.

41. Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois Consumer Fraud Act") provides, in relevant part:

> "Unfair methods of competition and unfair or deceptive acts or practices… or the use or employment of any practice described in Section 2 of the "Uniform Deceptive Trade Practices Act" … in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

**ANSWER:** Illumina states that the quoted statute speaks for itself.

42. Illumina violated the Illinois Consumer Fraud Act by engaging in the conduct described herein including, but not limited to, misrepresenting the true nature of the license, calculated solely to deceive consumers into purchasing its sequencing units on the secondary market from Illumina, as opposed to IET or one of its other competitors.

**ANSWER:** Illumina denies the allegations of Paragraph 42.

43. Illumina's deceptive and unfair conduct occurred in the course of conduct involving the trade and commerce of sequencing unit sales on the secondary market, and substantially affects consumers, including Illinois consumers, and consumer protection concerns.

**ANSWER:** Illumina denies the allegations of Paragraph 43.

44. Through its deceptive and unfair conduct, Illumina has directly and/or indirectly harmed consumers, including Illinois consumers, by affecting competition generally, and by eliminating the advantages available to consumers where competition is fostered, including, but not limited to the consumers' ability to purchase product on the secondary market from the seller

who they believed would provide the best prices and best services. Some of the Illinois consumers harmed by Illumina's practices include: (a) GoPath Laboratories located in Buffalo Grove, Illinois, (b) the University of Chicago located in Chicago, Illinois, (c) Tempus located in Chicago, Illinois, (d) Argon National Laboratory located in Argon, Illinois, and (e) ACGT Inc. located in Wheeling, Illinois. On one or more occasions, Illumina directed its unfair and deceptive conduct directly to the Illinois consumer in the State of Illinois.

**ANSWER:** Illumina denies the allegations of Paragraph 44.

45. Illumina's deceptive and unfair conduct has also resulted in damage to IET in the form of lost profits, as alleged herein. On information and belief, Illumina's conduct has resulted in lost sales of preowned Illumina equipment to the following Illinois customers dating back to 2010: (i) loss of sales of two separate Illumina GA2X systems to the University of Chicago in Chicago, Illinois, (ii) loss of sale of a HiSeq 2500 to Tempus in Chicago, Illinois, (iii) loss of sale of Illumina GA2X to Argon National Laboratory in Argon, Illinois, and (iv) loss of sale of Illumina HiSeq 2500 to ACGT Inc. in Wheeling, Illinois.

**ANSWER:** Illumina denies the allegations of Paragraph 45.

46. Illumina's willful violations of the Illinois Consumer Fraud Act, as alleged herein, entitle IET to relief in the form of compensatory damages, costs, attorneys' fees, punitive damages, and injunctive relief under Section 10a of the Act.

**ANSWER:** Illumina denies the allegations of Paragraph 46.

### COUNT IV

### Violation of Illinois Uniform Deceptive Trade Practices Act
### (815 ILCS 510/1 et seq.)

47. IET realleges Paragraphs 1-24, 26-35, 37-39, and 41-46 as Paragraph 47 of this Count IV, as though fully set forth herein.

**ANSWER:** Illumina adopts and realleges its answers to 1-24, 26-35, 37-39, and 41-46 of the SAC as its answer to Paragraph 47 of the SAC.

48. Section 2 of the Uniform Deceptive Trade Practices Act ("DTPA") provides, in relevant part:

> (a) A person engages in a deceptive trade practice when, in the course of his or her business, vocation, or occupation, the person:
> * * *
> (11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

16

(12) engages in any other conduct which similarly creates a likelihood of confusion or misunderstanding.

**ANSWER:** Illumina states that the quoted statute speaks for itself.

49. Illumina violated Section 2 of the DTPA by willfully engaging in the deceptive trade practices enumerated herein, entitling IET to injunctive relief, costs and reasonable attorneys' fees.

**ANSWER:** Illumina denies the allegations of Paragraph 49.

## COUNT V

### Violation of Illinois Antitrust Act
### (740 ILCS 10/1 et seq.)

50. IET realleges Paragraphs 1-24, 26-35, 37-39, 41-46, and 48-49 as Paragraph 50 of this Count V, as though fully set forth herein.

**ANSWER:** Illumina adopts and realleges its answers to Paragraphs 1-24, 26-35, 37-39, 41-46, and 48-49 of the SAC as its answer to Paragraph 50 of the SAC.

51. Section 10/3(3) of the Illinois Antitrust Act provides that "Every person shall be deemed to have committed a violation of this Act who shall … [e]stablish, maintain, use, or attempt to acquire monopoly power over any substantial part of trade or commerce of this State for the purpose of excluding competition … in such trade or commerce." 740 ILCS 10/3(3).

**ANSWER:** Illumina states that the quoted statute speaks for itself.

52. Illumina violated the Illinois Antitrust Act by engaging in the conduct alleged herein, resulting in damage to IET and entitling it to compensatory damages, costs, attorneys' fees, and injunctive relief under Section 7 of the Act.

**ANSWER:** Illumina denies the allegations of Paragraph 52.

## COUNT VI

### Intentional Interference with a Prospective Economic Advantage

53.     IET realleges Paragraphs 1-24, 26-35, 37-39, 41-46, 48-49, and 51-52 as Paragraph 53 of this Count VI, as though fully set forth herein.

**ANSWER:**     Illumina adopts and realleges its answers to Paragraphs 1-24, 26-35, 37-39, 41-46, 48-49, and 51-52 of the SAC as its answer to Paragraph 53 of the SAC.

54.     Illumina knew that IET had a reasonable expectancy of completing sales and/or leases of the refurbished sequencing units to those customers specified herein and others.

**ANSWER:**     Illumina denies the allegations of Paragraph 54.

55.     Illumina nevertheless intentionally, maliciously and without justification acted with the purpose of interfering with IET's reasonable prospective economic advantage, resulting in damage to IET and entitling it to compensatory damages and injunctive relief.

**ANSWER:**     Illumina denies the allegations of Paragraph 55.

## COUNT VII

### Declaratory Judgment Under 28 U.S.C. §2201(a)

56.     IET realleges Paragraphs 1-24, 26-35, 37-39, 41-46, 48-49, 51-52, and 54-55 as Paragraph 56 of this Count VII, as though fully set forth herein.

**ANSWER:**     Illumina adopts and realleges its answers to Paragraphs 1-24, 26-35, 37-39, 41-46, 48-49, 51-52, and 54-55 of the SAC as its answer to Paragraph 56 of the SAC.

57.     Pursuant to 17 U.S.C. §109(a), "the owner of a particular copy or phonorecord lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to sell or otherwise dispose of the possession of that copy or phonorecord."

**ANSWER:**     Illumina states that the quoted statute speaks for itself.

58.     The operating and data collection software which is the subject of Illumina's threatened "site licensing fee" are copies lawfully made under Title 17, and are owned by third parties from whom IET sources sequencing unit equipment.

**ANSWER:**    Illumina denies the allegations of Paragraph 58.

59.    When Illumina sells new sequencing units to its customers, such sales include, as part of the purchase price, a sale of the operating and data collection software.  Such sales consist of a single, up-front payment to Illumina with no further payments or other recurring benefit to Illumina.  The software agreements accompanying such sales are of perpetual duration and never require the purchaser to return or destroy the software unless the agreement is terminated by Illumina.  As such, and notwithstanding that Illumina has characterized its software as being "licensed," including in the DLL Agreement, the initial transfer of Illumina's operating and data collection software to its customers constitutes a "sale" for the purposes of 17 U.S.C. §109, and the purchasers of such software are "owners" of lawfully made copies.

**ANSWER:**    Illumina denies the allegations of the first and second sentences of

Paragraph 59.  Illumina admits that software licensing agreements accompany its sales of

*Sequencing Systems* and states that those agreements speak for themselves.  Illumina denies the

allegations of the fourth sentence of Paragraph 59.

60.    Pursuant to 17 U.S.C. §109(a), any such "owner" of the operating and data collection software is entitled to sell or otherwise dispose of its copy without the authority of Illumina

**ANSWER:**    Paragraph 60 consists of a legal conclusion to which no response is

required; Illumina otherwise denies the allegations of Paragraph 60.

61.    By threatening IET's customers, including Illinois customers, with excessive "site licensing fees" for the operating and data collection software and otherwise interfering with IET's sales, including without limitation Illumina's refusal to service sequencing units without what it deems to be a "proper" software license, Illumina has caused IET to lose sales of sequencing units it otherwise would have been able to make.  If Illumina is allowed to continue in its course of conduct, IET will continue to lose sales of sequencing units it otherwise would be able to make.

**ANSWER:**    Illumina admits that it has quoted software relicensing fees to potential

buyers or users of preowned Illumina Sequencing Systems for use of the operating and data

collection software on those Systems.  Illumina further admits that it has refused to service

Illumina equipment for such buyers or users if they have not paid applicable software relicensing

fees for use of the software on the equipment.  Illumina lacks information or knowledge

sufficient to form a belief as to the truth of the allegations that any such buyers or users are

customers of IET or that IET has lost or will lose sales of sequencing systems it otherwise would

have been able to make.  Illumina denies the remaining allegations of Paragraph 61.

62.     The Declaratory Judgment Act provides as follows:

> In a case of actual controversy within its jurisdiction … any court of the United
> States … may declare the rights and other legal relations of any interested party
> seeking such declaration, whether or not further relief is or could be sought.
>
> 28 U.S.C. §2201(a)

**ANSWER:**     Illumina states that the quoted statute speaks for itself.

63.     A real and actual controversy exists between IET and Illumina as to whether
Illumina may charge or threaten to charge a "site licensing fee" to customers purchasing Illumina
sequencing units from IET.

**ANSWER:**     Paragraph 63 consists of a legal conclusion to which no response is

required; Illumina otherwise denies the allegations of Paragraph 63.

## PRAYER FOR RELIEF

64.     WHEREFORE, Plaintiff International Equipment Trading, Ltd. respectfully
requests that the Court enter judgment in its favor and against Defendant Illumina LLC as
follows:

A.     Declaring that Defendant violated and is in violation of the Sherman Act § 2, the
Clayton Act §§ 4 and 16, the Illinois Consumer Fraud and Deceptive Business Practices Act, and
the Illinois Uniform Deceptive Trade Practices Act, the Illinois Antitrust Act, and that it
tortuously interfered with Plaintiff's business expectancy as alleged herein;

B.     Awarding Plaintiff treble compensatory damages sustained by Plaintiff as a result
of Defendant's actions, including lost profits, together with prejudgment interest thereon;

C.     Ordering injunctive relief preventing and enjoining Defendant and all persons
acting on its behalf from engaging in the predatory and unlawful practices alleged herein;

D.     Awarding Plaintiff the costs, expenses, and reasonable attorneys' fees and
experts' fees for bringing and prosecuting this action;

E.     Declaring that IET's brokering of the sale of Illumina's operating and data
collection software to its customers is protected by 17 U.S.C. §109, and does not infringe on
Illumina's copyrights or other rights, and therefore that Illumina has no right to charge or

threaten to charge a "licensing fee" to IET's customers or otherwise interfere with IET's brokering of authentic, used copies of Illumina's software; and

F.        Ordering such other and further relief as the Court deems just and proper.

**ANSWER:**     To the extent the allegations of Paragraph 64 contain legal conclusions, they require no response.  Illumina admits that IET seeks the requested relief, but denies that IET is entitled to the relief requested or to any other relief.  Illumina otherwise denies the allegations of Paragraph 64.

## JURY DEMAND

65.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

**ANSWER:**     Illumina admits that IET demands a trial by jury on all issues so triable. To the extent the allegations of Paragraph 65 contain legal conclusions, they require no response. Illumina otherwise denies the allegations of Paragraph 65.

## AMENDED AFFIRMATIVE DEFENSES

Without assuming any burden Illumina would not otherwise have, Illumina asserts the following Affirmative Defenses. In support of these Affirmative Defenses, Illumina incorporates by reference herein the facts set forth in its Answer to IET's Second Amended Complaint ("SAC") and in its Counterclaims.

## FIRST DEFENSE

For the reasons stated in Illumina's Answer to the SAC and the memoranda of points and authorities filed in support of Illumina's motions to dismiss IET's Amended Complaint and SAC, *see* Dkt. Nos. 24, 56, the SAC fails in whole or in part to state a claim upon which relief may be granted under Rule 12 of the Federal Rules of Civil Procedure.

The SAC fails to state a claim for attempted monopolization because IET fails to plead a legally cognizable product market. *See* Dkt. 56 at 3-6. IET's alleged used product markets fail as a matter of law because those purported markets improperly exclude new genome sequencing systems. *See* Dkt. 56 at 4. IET's alleged single-brand product submarket fails as a matter of law for the additional reason that Illumina has competitors in the genome-sequencing market, as the SAC acknowledges. *See* Dkt. 56 at 5-6.

The SAC also fails to state a claim for attempted monopolization because IET does not plead that Illumina has a dangerous probability of achieving monopoly power. *See* Dkt. 56 at 6-8. IET does not allege that Illumina has a high market share in the alleged product markets; to the contrary, IET alleges facts that suggest a high degree of competition in those markets. *See* Dkt. 56 at 6-8.

The SAC also fails to state a claim for attempted monopolization because IET does not plead that Illumina engaged in predatory or anticompetitive conduct. *See* Dkt. 56 at 9-13. As the copyright owner of the software on its instruments, Illumina has a lawful right to charge relicensing fees, and its decision to waive those fees in certain instances constitutes procompetitive discount pricing. *See* Dkt. 56 at 10-11. Moreover, Illumina's alleged refusal to service or support instruments does not constitute exclusionary conduct because Illumina has no

general duty to deal with other parties. *See* Dkt. 56 at 11-12. IET also fails to adequately allege exclusionary conduct because it does not allege that it lost any sales as a direct result of Illumina's actions. *See* Dkt. 56 at 12. In addition, IET's claim that Illumina engaged in predatory or anticompetitive conduct by misrepresenting its contractual right to charge a software relicensing fee fails because misrepresentations are generally not actionable under antitrust law (*see* Dkt. 56 at 12-13), and because Illumina made no misrepresentation here as to its contractual ability to charge software relicensing fees, given that, under the "first sale doctrine," it licenses, rather than sells, its software (*see* Dkt. 56 at 12-13).

Given that Illumina's decision to selectively waive the software relicensing fee constitutes procompetitive discount pricing as a matter of law, any injury to IET did not result from conduct that reduced competition. *See* Dkt. 56 at 8-9. Accordingly, IET fails to adequately plead antitrust injury. *See* Dkt. 56 at 8-9. IET's failure to plead that Illumina engaged in predatory or anticompetitive conduct also means that it fails to plead that Illumina has the requisite specific intent to monopolize. *See* Dkt. 56 at 10.

IET fails to state a claim under the Illinois Uniform Deceptive Trade Practices Act ("UDTPA") because it does not allege that it lost a sale to any Illinois customer. *See* Dkt. 56 at 13-14. IET also fails to state a claim under UDTPA Section 11 because Illumina's allegedly false statements did not concern price reductions. *See* Dkt. 56 at 14. In addition, IET fails to state a claim under UDTPA Section 12 because none of Illumina's alleged behaviors involve confusion related to the use of a deceptive trade name, trademark, or other distinctive symbol. *See* Dkt. 56 at 14-15. IET fails to state a claim for interference with prospective economic advantage because it cannot show that any interference was unjustified, given that IET does not adequately allege that Illumina misrepresented its right to charge a software relicensing fee. *See* Dkt. 24 at 19. IET's claim for declaratory relief also fails because Illumina licenses, rather than sells, its software, and because this claim is duplicative of IET's state fraud claims. *See* Dkt. 24 at 20.

Finally, the SAC fails to state a claim because IET does not plead fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. Specifically, while IET's claims are based on the premise that Illumina made "false" (*i.e.*, fraudulent) statements, IET fails to specify when, where, or how these statements were allegedly made, and fails to specify the identity of the Illumina representative who allegedly made them. *See* Dkt. 24 at 6-8.

## SECOND DEFENSE

IET's claims are barred, in whole or in part, by the equitable doctrines of unclean hands and *in pari delicto* because, among other reasons, IET alleges that Illumina's wrongful conduct has been occurring since 2007, yet IET waited until 2017 to file this lawsuit. Illumina invested considerably in growing its business during this period and in so doing has continued to license its software and charge software relicensing fees in a manner that IET only now alleges is improper. During this period, IET has falsely held itself out to potential customers as an authorized reseller of Illumina Sequencing Systems and represented that IET has an agreement with Illumina for the resale of such systems. IET has also falsely represented to potential customers that certain used Illumina Sequencing Systems meet the original manufacturer's—i.e., Illumina's—specifications; that Illumina sells (as opposed to licenses) its copyrighted software; that Illumina does not charge software relicensing fees; and that its quotes to customers include relicensing fees, revalidation fees, and/or reinstallation fees. *See* Counterclaims ¶¶ 36-74.

## THIRD DEFENSE

IET's claims for damages are barred to the extent IET seeks damages beyond the applicable statutes of limitation. IET knew or reasonably should have known of the basis for its claims in 2007, but did not file its complaint until July 6, 2017. The statute of limitations for claims brought under the Sherman Act (15 U.S.C. § 2), Clayton Act (15 U.S.C. §§ 15(a), 26), and Illinois Antitrust (740 ILSC 10/1 *et seq.*) is four years. The statute of limitations for claims brought under the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/1 *et seq.*) and Illinois Uniform Deceptive Trade Practices Act (815 ILCS 510.1 *et seq.*)

24

is three years.  The statute of limitations for claims of intentional interference with prospective economic advantage is two years.  Accordingly, IET's claims under the Sherman Act (Count I), Clayton Act (Count II), and Illinois Antitrust Act (Count V) are barred to the extent IET seeks damages that accrued prior to July 7, 2013 on those claims.  IET's claims under the Illinois Consumer Fraud and Deceptive Business Practices Act (Count III) and Illinois Uniform Deceptive Trade Practices Act (Count IV) are barred to the extent IET seeks damages that accrued prior to July 7, 2014 on those claims.  IET's claim for intentional interference with a prospective economic advantage (Count VI) is barred to the extent IET seeks damages that accrued prior to July 7, 2015 on that claim.

### FOURTH DEFENSE

IET is not entitled to any relief, or is entitled to reduced relief, because it has failed to mitigate the alleged damages it claims to have suffered.

## COUNTERCLAIMS

Pursuant to Federal Rule of Civil Procedure 13, Illumina, Inc. ("Illumina") counterclaims against International Equipment Trading, Ltd. ("IET") and alleges the following:

## PARTIES

1. Illumina is a corporation organized and existing under the laws of Delaware with a principal place of business in San Diego, California.

2. On information and belief, IET is a corporation organized and existing under the laws of Illinois with its principal place of business in Vernon Hills, Illinois.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 based on diversity of citizenship and the amount in controversy exceeding $75,000, exclusive of interest and costs.

4. This Court has personal jurisdiction over IET at least because IET submitted to the jurisdiction of this Court by bringing the instant action.

5. Venue is proper in this district pursuant to 28 U.S.C. §1391(b)(1) because IET resides in this district and is the only Counterclaim Defendant.

## GENERAL ALLEGATIONS

6. As a startup in 1998, Illumina aspired to transform human health. Illumina's initial products enabled researchers to explore DNA at an entirely new scale, helping them create the first map of gene variations associated with health, disease, and drug response.

7. Today, Illumina is a global leader in genomics—the study of genomes. A genome is the complete set of genetic material within an organism. Genomics includes the sequencing of whole genomes—the process of determining the complete DNA sequence of an organism's genome at a single time. Genomics is also concerned with the structure, function, comparison, and evolution of genomes and portions thereof.

8. Illumina's contributions to the field of genomics include the development of a line of products known as genome sequencing systems ("Sequencing Systems"), including the

MiniSeq System, the MiSeq Series, NextSeq Series, HiSeq Series, HiSeq X Series, and NovaSeq 6000 System.

9.     Illumina has also developed the software that runs on the Sequencing Systems, which performs certain protocols, including data collection and analysis and operation of the Sequencing Systems.

10.     Illumina also provides servicing and repair services to the users of its Sequencing Systems.

11.     Illumina owns the copyright for the software that runs on its Sequencing Systems and licenses that software to the users of its Systems.  In this regard, Illumina can be compared to Apple, which has developed both personal computing devices and also the software that runs on those devices, which it then licenses to end users.

12.     Illumina Sequencing Systems deliver the most accurate human genome and the highest yield of error-free reads.  To date, millions of samples have been sequenced and thousands of papers have been published using Illumina sequencing technology.

13.     Illumina's HiSeq Sequencing Systems have become the production platform of choice for major Genome Centers and leading institutions around the world.  A true and accurate representation of a HiSeq 4000 System is shown below.



14.     Illumina's customers include, amongst others, genomic research centers, academic institutions, government laboratories, and hospitals, as well as pharmaceutical,

biotechnology, agrigenomics, commercial molecular diagnostic laboratories, and consumer genomics companies.

**A.** **Illumina's Sales of New and Used Illumina Sequencing Systems**

15.     When Illumina sells new Sequencing Systems, Illumina and the customer enter into terms and conditions of sale and software license agreements.

16.     If the customer buys a service contract from Illumina, Illumina and the customer also agree to service contract terms and conditions.

17.     Under the software license agreements, terms and conditions of sale, and service contract terms and conditions, the software on the Sequencing Systems is expressly licensed, not sold, to the customer.

18.     In addition to new Sequencing Systems, Illumina also sells used (or "preowned") Sequencing Systems.

19.     Before selling used Sequencing Systems to customers, Illumina performs a System Health Check and other revalidation services in order to certify that the instrument meets Illumina's original manufacturer specifications.

20.     When selling new and used Illumina Sequencing Systems, Illumina charges one price for the Sequencing System (the hardware) plus any applicable fees (for example, licensing or relicensing fees) at the time the unit is sold.

**B.** **Third-Party Sales of Used Illumina Sequencing Systems**

21.     Used Illumina Sequencing Systems are also sold by third-party resellers, including former customers.

22.     Illumina generally does not perform System Health Checks on Illumina Sequencing Systems sold by third-party resellers before resale, and thus those Systems typically are not certified before resale.

23.     However, after the resale, Illumina generally performs a System Health Check and other revalidation services on the System to recertify it to Illumina's specifications.

24.     This revalidation process is important, as it enables Illumina to ensure an optimal end-user experience with its Sequencing Systems.

25.     In connection with such third-party resales, Illumina generally charges the new user a software relicensing fee (for use of the software on the System), a revalidation fee (to recertify the System), and a reinstallation fee (for the cost associated with reinstalling the System at the new user's site).

**C.     De Lage Landen Financial Services, Inc.**

26.     Illumina partners with De Lage Landen Financial Services, Inc. ("DLL"), a third-party financing company, to provide leasing and other financing services to Illumina customers.

27.     Pursuant to a Master Contract Financing Program Agreement between Illumina and DLL (the "DLL Contract"), DLL purchases new Sequencing Systems from Illumina and then leases them to customers.

28.     Under the DLL Contract, Illumina has a right of first refusal to buy back the DLL-leased Sequencing Systems at the end of the applicable lease term.

29.     If Illumina does not exercise this right, DLL may then resell or re-lease the Sequencing System to a second buyer or second lessor and is permitted, in connection with such a transfer, to transfer the software license to the second buyer or second lessor without that buyer or lessor incurring a relicensing fee from Illumina.

30.     Title to the Sequencing System must remain with DLL until the Sequencing System is transferred to the second buyer or second lessor in order for the free software license transfer to apply.

31.     Thus, if DLL sells a formerly DLL-leased Sequencing System to a third-party reseller, which in turn resells or re-leases the Sequencing System to a second end-user, such a resale or re-lease is not covered by the DLL Agreement's provision allowing free transfer of the software license; and Illumina may charge the second end-user a relicensing fee.

32.     On information and belief, DLL sells formerly DLL-leased Sequencing Systems to IET, which in turn resells or re-leases those Systems to second end-users.

33.     IET is not an authorized reseller of Illumina's.

34.     Illumina has no contracts with IET governing the resale or re-lease of Illumina Sequencing Systems.

35.     IET is not authorized by Illumina to quote for Illumina fees and services in connection with reselling or re-leasing formerly DLL-leased Sequencing Systems or any other Sequencing Systems.

**D.     IET's False Representations to Illumina Customers**

36.     On information and belief, IET falsely informs prospective new users of preowned Illumina Sequencing Systems that Illumina does *not* charge software relicensing fees.

37.     According to IET, Illumina sells its copyrighted software to the original user of the Sequencing System.

38.     This is wrong; Illumina expressly licenses its copyrighted software on the Sequencing Systems and may charge relicensing fees to new users of preowned Illumina Sequencing Systems.

39.     On information and belief, IET also falsely informs prospective new users of formerly DLL-leased Sequencing Systems that are resold or re-leased by other third-party resellers (besides DLL) that Illumina does *not* charge relicensing fees.

40.     According to IET, Illumina expressly consented in the DLL Contract to the transfer by such resellers of the software loaded on those Sequencing Systems to the new end-users.

41.     This representation is false because the DLL Contract permits only DLL to transfer formerly DLL-leased Sequencing Systems to new users free of software relicensing fees.

42.     In addition, when IET quotes prices for formerly DLL-leased Sequencing Systems that, on information and belief, IET purchased from DLL, IET falsely informs the new prospective users that the prices include relicensing fees, revalidation fees, and/or reinstallation fees.

43.     These representations are false because Illumina separately charges such fees to such new users; therefore, the price of the Sequencing System quoted by IET cannot possibly include such fees.

44.     Moreover, IET is not authorized by Illumina to quote for Illumina fees and services in connection with reselling or re-leasing formerly DLL-leased Sequencing Systems (or any other Sequencing Systems).

45.     IET also falsely represents to such prospective new users that IET has an agreement with Illumina for the resale of Sequencing Systems.

46.     Illumina has no contracts with IET governing the resale or re-lease of Illumina Sequencing Systems (or anything else).

**E.     IET's False Representations to MedGenome Inc.**

47.     IET made false representations to MedGenome Inc. ("MedGenome"), a genomics-based diagnostics and research company.

48.     On or around May 15, 2017, VL Ramprasad of MedGenome emailed Eda Kaya of IET, asking if IET had in stock a "Refurb" HiSeq 2500.

49.     In response, IET quoted MedGenome a price of $230,000 for a "qualified" Illumina HiSeq 2500 Sequencing System that, on information and belief, IET had purchased from DLL.

50.     Illumina's belief that IET had purchased the Sequencing System from DLL is based on IET's representation to MedGenome that IET had the Sequencing System "in stock."

51.     IET represented to MedGenome that the Sequencing System "includes all software licensing (normally Illumina charges around $70,000 for this software re-licensing), which transfers with the Instrument because of a special agreement Illumina has in place with our leasing partner [DLL]"; and that the Sequencing System "falls under [Illumina's] guarantee of software site license transfer."

52.     IET later referred to DLL's agreement with Illumina as "*our agreement* with Illumina" (emphasis added).

53.     These representations are false.  IET has no agreement with Illumina; rather, DLL has an agreement with Illumina.

54.     Moreover, under the DLL Contract, only DLL may transfer a formerly DLL-leased Sequencing System to a second buyer or second lessor free of software relicensing fees.

55.     In this instance, however, DLL was not transferring the formerly DLL-leased Sequencing System to MedGenome; IET was.  Therefore, the software license did not freely transfer to MedGenome, and Illumina was entitled to charge a relicensing fee.

56.     IET further represented to MedGenome that the preowned HiSeq 2500 was "guaranteed to meet original manufacturer's specifications"; that "under the agreement that Illumina has with our leasing partner [DLL], [Illumina] will recertify and reinstall the HiSeq 2500 at the next end user's facility"; and that the "official quotation will indicate that recertification and reinstallation to OEM specs by Illumina is included."

57.     These representations are also false because Illumina separately charges revalidation and reinstallation fees to new users of preowned Illumina Sequencing Systems that are resold or re-leased by third-party resellers like IET.  Accordingly, IET's representation to MedGenome that IET's price quote included "recertification and reinstallation" fees "to OEM specs" is false.

58.     As noted above, revalidation is a critical step in allowing Illumina to continue to stand behind preowned Illumina Sequencing Systems.  Revalidation ensures that the Systems meet Illumina's specifications, thereby optimizing end-users' experience.

59.     By falsely representing that the instruments were "guaranteed" to meet those specifications, IET effectively misrepresented that Illumina already stood behind the Sequencing Systems.

60.     As Illumina later explained to MedGenome, "it is impossible that [IET] can offer you a[] used HS2500 that comes with installation, recertification and licensing, which are needed before our service team can issue a quote for service options."

32

61.    On May 26, 2017, IET represented to MedGenome that IET had available one preowned HiSeq 2500 with a different version of chemistry "with the same guarantees with Illumina."

62.    This representation is also false because—based on IET's representation to MedGenome that "*we have* one available"—the Sequencing System had already been sold by DLL to IET.

63.    Therefore, the software license did not freely transfer from IET to MedGenome, and relicensing, revalidation, and reinstallation fees would be separately charged by Illumina.

F.    **IET's False Representations to GoPath Laboratories**

64.    On or around January 2016, GoPath Laboratories ("GoPath"), a molecular diagnostic laboratory, purchased or leased a HiSeq 2500 Sequencing System from IET that, on information and belief, IET had previously purchased from DLL.

65.    Illumina's belief that IET had purchased the Sequencing System from DLL is based on (1) the allegation in IET's Amended Complaint that GoPath "was able to purchase [a HiSeq 2500] from IET" and (2) IET's representation to MedGenome that "[w]e recently sold" a HiSeq 2500 to GoPath.

66.    On information and belief, IET made similar misrepresentations to GoPath that it made to MedGenome—namely, that the license for the software on the Sequencing System would transfer for free to GoPath, that revalidation and reinstallation fees were included in IET's quote, and that IET had an "agreement" with Illumina.

67.    Illumina's belief that IET made similar misrepresentations to GoPath is based on IET's representation to MedGenome that "[w]e recently sold" a HiSeq 2500 to GoPath that, according to IET, was also subject to "the agreement that Illumina has with our leasing partner."

68.    IET's misrepresentations about the applicability of the relicensing fee set GoPath's expectations such that GoPath's representatives did not think they would have to pay a relicensing fee.

69.     Because of those misrepresentations, in order to secure the sale, Illumina had to forego charging a relicensing fee, and thus lost revenue on the sale.

**G.     IET's False Representations to TOMA Biosciences**

70.     In or around March 2015, TOMA Biosciences ("TOMA"), a genomics company, purchased or leased a HiSeq 2500 Sequencing System from IET that, on information and belief, IET had previously purchased from DLL.

71.     On information and belief, IET made similar misrepresentations to TOMA that it made to MedGenome—namely, that the license for the software on the Sequencing System would transfer for free to TOMA, that revalidation and reinstallation fees were included in IET's quote, and that IET had an "agreement" with Illumina.

72.     Illumina's belief that IET had purchased the Sequencing System from DLL and that IET made similar misrepresentations to TOMA is based IET's representation to MedGenome that "[w]e recently sold" a HiSeq 2500 to TOMA that, according to IET, was also subject to "the agreement that Illumina has with our leasing partner."

73.     IET's misrepresentations about the applicability of the relicensing fee set TOMA's expectations such that TOMA's representatives did not think they would have to pay a relicensing fee.

74.     Because of those misrepresentations, in order to secure the sale, Illumina had to forego charging a relicensing fee, and thus lost revenue on the sale.

**FIRST COUNTERCLAIM**
**(Declaratory Judgment)**

75.     Illumina incorporates Paragraphs 1-74 of its Counterclaims as if fully set forth herein.

76.     On July 6, 2017, IET filed this lawsuit, alleging that Illumina may not lawfully charge or quote relicensing fees to new users of the software on its Sequencing Systems, including users that purchase or lease preowned Illumina Sequencing Systems from IET, because

Illumina "actually sells" rather than licenses its software under its software license agreements with its customers.

77.     A real and actual controversy exists between IET and Illumina as to whether Illumina may lawfully charge or quote relicensing fees to new users of the software on its Sequencing Systems, including users that purchase or lease preowned Illumina Sequencing Systems from IET.

78.     Illumina has lawfully charged or quoted, and may lawfully charge or quote, relicensing fees to new users of the software on its Sequencing Systems, including users that purchase or lease preowned Illumina Sequencing Systems from IET.

79.     Illumina is entitled to declaratory judgment that it may lawfully charge or quote relicensing fees to new users of the software on its Sequencing Systems, including users that purchase or lease preowned Illumina Sequencing Systems from IET.

**SECOND COUNTERCLAIM**
**Violation of the Lanham Act**
**(15 U.S.C. § 1125(a)(1))**

80.     Illumina incorporates Paragraphs 1-79 of its Counterclaims as if fully set forth herein.

81.     Section 43(a)(1) of the Lanham Act, 15 U.S.C. § 1125(a)(1), provides in pertinent part:

> (a)(1)  Any person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> (A)  is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

35

(B) in commercial advertising or promotion, misrepresents the
nature, characteristics, qualities, or geographic origin of his or her
or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he
or she is or is likely to be damaged by such act.

82.     IET's actions described above constitute unfair competition and false advertising
in violation of 15 U.S.C. § 1125(a)(1).

83.     Consumers have been and are likely to be materially misled and deceived by
IET's misrepresentations to believe, among other things, that Illumina does not charge software
relicensing fees to new users of preowned Illumina Sequencing Systems and/or that IET is an
authorized reseller of Illumina's with authority to quote prices for Illumina products and
services.

84.     IET knew or should have known that its statements were false and/or likely to
mislead consumers.

85.     As an actual and proximate result of IET's unfair competition and false
advertising, Illumina has suffered damages in an amount to be determined at trial, including but
not limited to foregone relicensing fees, and unless IET is enjoined, Illumina will continue to
suffer irreparable harm and damages to its business, reputation, and goodwill.

### THIRD COUNTERCLAIM
### Violation of the California False Advertising Law
### (Cal. Bus. & Prof. Code § 17500 *et seq.*)

86.     Illumina incorporates Paragraphs 1-85 of its Counterclaims as if fully set forth
herein.

87.     California Business and Professions Code Section 17500 *et seq.* prohibits false
advertising.

88.     By its actions described above, IET has engaged in false advertising in violation
of California Business and Professions Code Section 17500 *et seq.*

89.     Consumers have been and are likely to be materially misled and deceived by IET's misrepresentations to believe, among other things, that Illumina does not charge software relicensing fees to new users of preowned Illumina Sequencing Systems.

90.     IET knew or should have known that its statements were false and/or likely to mislead consumers.

91.     As an actual and proximate result of IET's false advertising, Illumina has suffered damages in an amount to be determined at trial, including but not limited to foregone relicensing fees, and unless IET is enjoined, Illumina will continue to suffer irreparable harm and damages to its business, reputation, and goodwill.

### FOURTH COUNTERCLAIM
### Violation of the California Unfair Competition Law
### (Cal. Bus. & Prof. Code § 17200 *et seq.*)

92.     Illumina incorporates Paragraphs 1-91 of its Counterclaims as if fully set forth herein.

93.     California Business and Professions Code Section 17200 *et seq.* prohibits unfair competition, defined as "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

94.     By its actions described above, including but not limited to its violations of the Lanham Act and the California False Advertising Law, IET has engaged in unfair competition in violation of California Business and Professions Code Section 17200 *et seq.*

95.     As an actual and proximate result of IET's unfair competition, Illumina has suffered damages in an amount to be determined at trial, including but not limited to foregone relicensing fees, and unless IET is enjoined, Illumina will continue to suffer irreparable harm and damages to its business, reputation, and goodwill.

**FIFTH COUNTERCLAIM**
**(Intentional Interference with Prospective Economic Advantage)**

96.     Illumina incorporates Paragraphs 1-95 of its Counterclaims as if fully set forth herein.

97.     IET knew that Illumina had a reasonable expectancy of charging relicensing fees to new users of preowned Illumina Sequencing Systems, including users that purchase or lease preowned Illumina Sequencing Systems from IET.

98.     IET nevertheless intentionally and without justification acted with the purpose of interfering with Illumina's reasonable prospective economic advantage, resulting in damage to IET and entitling it to compensatory damages and injunctive relief.

**<u>ILLUMINA'S PRAYER FOR RELIEF</u>**

WHEREFORE, Illumina respectfully prays for judgment that:

A.     IET's Second Amended Complaint against Illumina is dismissed in its entirety with prejudice;

B.     IET is not entitled to the relief prayed for from Illumina in its Second Amended Complaint, or to any relief from Illumina whatsoever;

C.     Illumina may lawfully charge or quote relicensing fees to new users of the software on its Sequencing Systems, including users that purchase or lease preowned Illumina Sequencing Systems from IET;

D.     IET's conduct alleged herein violated the Lanham Act;

E.     IET has engaged in unfair competition in violation of the California Unfair Competition Law;

F.     IET has engaged in false advertising in violation of the California False Advertising Law;

G.      IET intentionally interfered with Illumina's prospective economic advantage;

H.      A permanent injunction is entered to restrain and enjoin IET, and all persons acting on its behalf or under its direction, and all persons acting in concert or participation with them, or any of them, from representing, directly or indirectly, or in any way suggesting (1) that Illumina may not or does not charge relicensing fees to new users of preowned Illumina Sequencing Systems; (2) that Illumina may not or does not charge relicensing fees, revalidation fees, and/or reinstallation fees to new users of formerly DLL-leased Sequencing Systems that are resold or re-leased by other third-party resellers to those new users, including IET; or (3) that IET has any "agreement" with Illumina relating to the resale or re-lease of preowned Illumina Sequencing Systems (or anything else);

I.      For an award of actual, consequential, and/or punitive damages in accordance with law resulting from IET's conduct;

J.      For an award of restitution pursuant to California Business and Professions Code §§ 17200 and 17500;

K.      For an award of all costs and expenses of this action;

L.      For an award of prejudgment and post-judgment interest;

M.      For reasonable attorneys' fees incurred in connection with this suit, as and to the extent allowed by law; and

N.      For an award of such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Illumina demands a jury trial on all issues triable by jury pursuant to Fed. R. Civ. P. 38.

**RESERVATION OF RIGHTS TO ASSERT**
**ADDITIONAL AFFIRMATIVE DEFENSES OR COUNTERCLAIMS**

Illumina reserves the right to amend or supplement its Answer, Affirmative Defenses, and Counterclaims.  Illumina continues to investigate the allegations of the SAC and has not knowingly or intentionally waived any applicable affirmative or other defenses or counterclaims. Illumina reserves the right to assert and rely upon other applicable affirmative or other defenses or counterclaims that may become available or apparent upon further investigation and discovery.

Dated:  May 13, 2019                              ILLUMINA, INC.

By  /s/ Anita F. Stork
One of Its Attorneys

Anita F. Stork (astork@cov.com) (*pro hac vice*)
COVINGTON & BURLING LLP
One Front Street
San Francisco, CA  94111-5356
(415) 591-6000

Jacob D. Koering (koering@millercanfield.com)
MILLER, CANFIELD, PADDOCK, AND STONE, P.L.C.
225 West Washington Street, Suite 2600
Chicago, Illinois  60606
(312) 460-4272

Attorneys for Defendant
ILLUMINA, INC.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, certifies that on May 13, 2019, she caused a true and correct copy of **ANSWER AND AMENDED AFFIRMATIVE DEFENSES OF ILLUMINA, INC. TO SECOND AMENDED COMPLAINT OF INTERNATIONAL EQUIPMENT TRADING AND COUNTERCLAIMS OF ILLUMINA, INC.** to be served via the Court's ECF/electronic mailing system.

/s/ Anita F. Stork